(No. 31366.— ▬▬▬▬▬)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* RAYMOND POLENIK, Plaintiff in Error.

*Opinion filed November 27, 1950.*

338

CHARLES A. BELLOWS, of Chicago, for plaintiff in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and JOHN S. BOYLE, State's Attorney, of Chicago, (JOHN T. GALLAGHER, RUDOLPH L. JANEGA, ARTHUR F. MANNING, and EDWARD F. HEALY, all of Chicago, of counsel,) for the People.

Mr. JUSTICE CRAMPTON delivered the opinion of the court:

The defendant, Raymond Polenik, was indicted in the criminal court of Cook County for the crime of murder. He was tried by a jury and found guilty, and his punishment fixed at death. He prosecutes this writ of error to review the proceedings, assigning as error alleged misconduct of the State's Attorney and the trial judge; the admission of allegedly incompetent and prejudicial testimony; the giving of certain instructions to the jury and the refusal

to give others tendered by plaintiff in error; the refusal to suppress evidence taken from his home without a search warrant; the admission in evidence of a confession allegedly obtained by force and duress; permitting a witness to testify on rebuttal who violated an order of court that all witnesses be excluded from the courtroom during the trial, and an alleged insufficiency in the proof of guilt.

The evidence for the prosecution disclosed that on January 9, 1949, at about 1:50 A.M., two police officers of the village of Stickney, while making a tour of duty in a squad car, came upon a Hudson automobile parked without lights or license plates on the west side of a public street, facing north. It appeared to be unoccupied. The squad car, which was traveling south, was brought to a stop adjacent to the parked automobile, and officer Lebloch, who was sitting on the right beside the driver, stepped out to investigate. When he turned his flashlight into the Hudson, the head of a man shot up in the front seat. Officer Loula, who had been driving the squad car, immediately stepped out, directing his light on the man sitting in the Hudson. The latter then made a motion to get out, and Lebloch said, "Where do you think you are going?" As officer Loula walked around the front of the Hudson, its occupant stepped out of the door and crouched down a few feet away. The two officers approached the man, with Loula directing his flashlight on him. He started to straighten up and then fired a gun several times, killing officer Lebloch and seriously wounding officer Loula, who lost consciousness for a while. When the latter regained consciousness he crawled to the squad car, signalled by radio for assistance, and was thereafter taken to a hospital. Neither police officer had drawn his pistol.

A young couple, seated in a parked automobile in front of the young lady's home a block west of the shooting, heard five shots and observed someone come running beside

defendant's home, which was situated at the rear of a lot facing on the street immediately west of the scene and which was separated from the scene only by a vacant lot. The person seen was tall and slender, and wore light clothing and no hat. The young couple thereafter drove to the scene of the shooting, saw a police officer lying in a pool of blood in front of a squad car, and immediately drove back to the home of the young lady. As the young man was returning to his car after escorting the girl to her door, he observed a man step off the sidewalk into a vacant lot. The man was tall and slender, and carried what appeared to be a bowling bag or overnight bag. Later that day a bag containing pistols and ammunition was found in the vacant lot, and police officers took some plaster casts of footprints appearing in the soft soil nearby. In the Hudson car parked at the scene of the shooting police found fourteen guns, four blackjacks, knives, and seventy-five boxes of ammunition. An investigation disclosed that the car had been stolen from an automobile agency on the night of the shooting, and that the weapons and ammunition found in the car were the proceeds of another burglary committed that night.

As a result of a description given by the wounded police officer, other officers called at the home of defendant, a young man nineteen years of age, and questioned him concerning the crime. He was later brought to the hospital and viewed by officer Loula, who identified him as the man who had fired the shots. Prior thereto defendant, after having submitted to a lie-detector test, had made an oral confession of the crime and had also stated, as he and police officers were leaving the police building, that "I knew when you measured that shoe yesterday that you had me." In addition defendant, after being asked to point out the place where he had put the gun used in the killing, looked around and found it in the vicinity of some buildings under construction. He also described the manner in which he had

gained entrance to the automobile agency from which the Hudson had been taken and the method by which he stole the guns and ammunition.

Defendant testified in his own behalf that on the evening of January 8, 1949, he attended a motion picture theater, returning home about 11:30 P.M. After talking to his parents for a while and reading some newspapers, he went to sleep. He later heard some shots and went with his father and sister to the scene of the shooting, where a crowd had gathered. They remained there about fifteen minutes, returning home through a vacant lot adjoining the rear of their house. They went back to bed and were awakened about five o'clock in the morning by police officers knocking on the door.

He testified further that at the detective bureau two police officers beat him for an hour and a half, until he consented to do what they wanted. Thereafter the police captain directed him to make an oral statement and to sign a confession before witnesses, and promised him that his punishment would be only fourteen years if he did so. Defendant replied that it was a lot of time for a crime he did not commit. The police captain then told him that he would get twenty years for violation of probation, to which defendant was subject for a previous crime, and asked him which was better, twenty years for violation of probation or fourteen years if he made a confession. Defendant was then taken to the State's Attorney's office, where he was again beaten until he consented to sign the confession. A lengthy statement was taken from him. He also testified that when he was taken back out to Stickney to look for the gun, a police officer first located it, and another officer was then directed to get newspapermen and photographers. When the latter arrived, after about a half hour, the police captain had defendant point a stick at the gun, and pictures were taken. Defendant denied that he originally pointed out the location of the pistol.

In rebuttal the prosecution produced testimony of police officers referred to in defendant's testimony, as well as that of assistant State's Attorneys and the examining physician, to the effect that no force was used on him and no promises made to him; that no bruises, contusions, or marks had been found on defendant's body; that he located the gun at an excavation near the scene of the shooting; and that he then admitted, in the presence of newspaper photographers and reporters, that it was the gun used by him in the killing, and that he had buried it in the place where it was found.

It is urged that the evidence is insufficient to prove, beyond a reasonable doubt, that defendant was the person in the Hudson car who fired the fatal shots. Officer Loula, an eyewitness, testified that he directed his light into the automobile and "got a good look" at its occupant; that the latter "looked right towards us;" and that after he left the car and stopped, the witness had his flashlight on him. He further related that two days later, when defendant was brought to his room at the hospital, the witness told him that he was the man who had shot him. The witness also pointed out defendant in the courtroom as the person who had fired the shots.

In addition, evidence was introduced showing an oral confession made to the police captain, another oral confession to a Federal probation and parole officer in the presence of defendant's father, and a written statement made and signed by defendant in the presence of two assistant State's Attorneys, the police captain and three businessmen from Stickney. In that statement defendant described in detail the method whereby he broke into the automobile agency, stole the car, burglarized the sporting goods store, taking a number of guns and ammunition, and proceeded to drive the Hudson car to the place where it was found by the police officers. The statement further related that

defendant had ducked down behind the wheel when the squad car approached, that after somebody got out of the police car defendant started to get out of the Hudson and one of the officers shouted, "Where do you think you are going?"; that defendant, then knowing it was a police officer, left the car, carrying two guns in a belt holster, and, as the men approached him, fired shots at them; that both officers fell down and defendant then started running, heading first to the east and then deciding to go to his home, where he took a leather bag, put the guns in it, and went out in some woods near an excavation southwest of his home. There he put the bag down, scraped a hole in the ground, and buried the gun just deep enough to get it covered with loose dirt.

In addition to the identification by the surviving police officer and the evidence of confessions, some other corroborating evidence was introduced, tending to show that defendant was the person who fired the shots. The evidence for defendant, on the other hand, consisted only of his own uncorroborated testimony. To discredit the identification by officer Loula, defendant complains that he was brought alone before him for identification and asserts that Loula must have previously known of his confession from newspapers or from relatives and other visitors in his room. While such circumstances may affect the weight and credibility of the identification, they are not sufficient, when considered together with the other evidence, to raise a reasonable doubt in the case at bar.

Defendant contends the court erred in admitting in evidence his confession, and complains that it was made under duress. A hearing was had on this question out of the presence of the jury, at defendant's request. At that hearing, after the prosecution had adduced evidence that the confession had not been obtained by force or promises and defendant produced no evidence in opposition thereto, the

court ruled that the statements were admissible. Under such circumstances the court was clearly correct, and defendant has shown no cause for complaint in this regard. The decision of the court on the question will not be disturbed unless it is manifestly against the weight of the evidence. *People* v. *Weber*, 401 Ill. 584.

During the trial before the jury, defendant testified that he was beaten and mistreated prior to making the confession. In opposition, the prosecution produced the testimony of the particular police officers, the assistant State's Attorneys, and the three businessmen who witnessed the taking of the statement, each of whom denied that defendant was subjected to any force or that promises of reward or immunity were made to him. Under the evidence thus presented this court would not be warranted in disturbing the finding below that the confession was voluntary.

Neither did the trial court err in refusing to suppress evidence obtained from defendant's home in his absence. The record discloses that a hearing was had out of the presence of the jury on the question whether certain clothing and shoes were unlawfully taken from defendant's home. At that hearing, evidence in opposition to the motion to suppress revealed that defendant had given his consent for the officers to go to his home and get the articles. The officers did this and obtained the shoes and clothing from defendant's father, who voluntarily gave them to the officers. While defendant denied giving the permission, the issue thus presented was a factual matter as to which the trial court's decision will not be disturbed where, as here, it is amply warranted by the evidence. When, after obtaining his permission to do so, officers go to a defendant's home and obtain articles which are later offered in evidence against him, there has been no illegal search and seizure requiring their suppression as evidence, even though the officers had no search warrant. *People* v. *DeFrates*, 395 Ill. 439.

Defendant insists the conduct of attorneys for the prosecution was such as to deprive him of a fair and impartial trial. He refers to numerous instances of improper questions and remarks of the assistant State's Attorney made during the course of the trial. The prosecution called as a witness defendant's probation and parole officer, who testified that in 1948 defendant was serving time at a Federal reformatory for violation of probation; that he was released on parole November 1, 1948; that the witness was his parole agent; that on the second day after the shooting he interviewed defendant in the presence of the latter's father at the Criminal Court Building, at which time defendant admitted shooting the two policemen. On cross-examination defendant's counsel elicited the information that defendant had been placed on probation for taking a jeep to get home while he was in military service; that after his discharge from the army he stole his employer's automobile and was given probation for the offense so that he could be returned to Federal authorities for violation of probation.

On redirect examination the witness was permitted to testify that defendant had stolen several jeeps over a period of months. The assistant State's Attorney then asked "Did he steal any Thompson submachine guns?" After objection to the question was sustained, the assistant State's Attorney asked whether F.B.I. agents recovered three submachine guns at defendant's home. Objection was again sustained, and the assistant State's Attorney, after remarking that defendant's counsel said he only took a jeep, asked "Did he take anything else?" After objection to this was sustained the witness was asked if defendant had a .45 caliber automatic pistol when he was arrested for stealing his employer's car. Objections to this were also sustained and the question was ordered stricken. The witness was then permitted to testify to a conversation with defendant in 1947 at the county jail in reference to the automobile

theft, in which defendant had told the witness that he had had a .45 German automatic pistol in the glove compartment of the car and that it was taken from him by the police when he was arrested.

On cross-examination of defendant, the State's Attorney asked him again whether he had stolen his employer's car, what make of car it was, how long he kept it, and whether he had any intention of returning it. He then proceeded to ask defendant whether, when he was arrested, he had any license plates on the car, to which question an objection was sustained. The State's Attorney then said: "They were not Mr. Wolf's license plates on the car, were they?" After objection was sustained, the further question was asked, "They were not your license plates on the car, were they?" Objections were again sustained, and the State's Attorney then remarked: "At the time that you were arrested driving Mr. Wolf's car, the one you were going to return to him, you had a .45 caliber pistol, loaded, in that car, didn't you?" The court again sustained objection by defendant's counsel.

Other instances of improper questions and comments of the prosecution appear in the record, but it is unnecessary to discuss them to show that defendant did not receive the fair and impartial trial to which he is entitled under the law. Whatever his character may have been, he had a right not to have brought to the attention of the jury details of past offenses unconnected with the crime for which he was being tried. Although the court repeatedly sustained objections to the questions, their effect was to convey to the jury the impression that defendant had criminal tendencies and was likely to commit a crime such as that for which he was being tried. Whether defendant had in the past stolen any submachine guns, or had possession of loaded pistols in cars stolen by him, or had placed other license plates on the stolen car were matters wholly unrelated to the crime charged in the indictment and without any evi-

dentiary value in determining his guilt of that offense. The only tendency such questions could have would be to prejudice defendant with the jury and influence it to return a verdict of guilty on general principles.

Evidence of the fact that defendant had committed a previous crime, for which he was on parole at the time of the shooting, is admissible for the purpose of establishing motive. But this rule cannot be used as a pretext for showing that defendant had possessed a loaded gun at the time of the prior offense or for disclosing other details of the past offense, and the prosecution must have known it was not competent to ask such questions. In view of the fact that the State persisted in such conduct after adverse rulings of the court, the prejudice to defendant is clear. In such cases the error is not cured by the court sustaining objections. (*People* v. *Black,* 317 Ill. 603.) In this case the jury not only determined the guilt of defendant, but also passed upon the punishment, fixing the extreme penalty of death. It is impossible to determine what influence the improper questions had upon the jury in determining those questions, (*People* v. *Mangano,* 375 Ill. 72,) and the verdict cannot be sustained even though there may be adequate evidence in the record to support it. Every defendant, whether he be good or bad, guilty or innocent, has the right to a trial by jury and not by a reviewing court. *People* v. *Black,* 317 Ill. 603.

The State attempts to justify the questions by arguing defendant's attorney brought out the facts that defendant was on probation for taking a jeep while in the army and that after he returned home he took his employer's automobile. It is said that as this was an attempt to minimize the gravity of the prior offenses, the prosecution had the right to correct the false impression by showing other details of a more serious nature. But defendant was not on trial for the prior crimes. Evidence of such crimes is admissible only when it tends to establish the crime for which

he is being tried. Before it becomes proper it must meet the same test as to relevancy and materiality to the issues as other evidence. (*People* v. *Mangano*, 375 Ill. 72.) Whether defendant had stolen several additional jeeps, or had possession of submachine guns, or kept a loaded pistol in the car which he had taken, was not relevant in showing motive for the present offense. Such questions only tended to establish details of past crimes and to convince the jury that defendant was a bad man generally.

In his argument to the jury the State's Attorney made repeated references to criminal lawyers in a manner calculated to arouse general prejudices. He announced to the jury "Are you going to allow this defendant to go back to the county jail and tell the other inmates he had a lawyer that hoodwinked the jury into saving his life? . . . We know the pattern of these defenses; we know how they follow. These defendants don't think up these defenses. Defense lawyers, who practice criminal law day in and day out, they are the ones that concoct these defenses, and we know what they are going to be the first day we arrest a man. . . . We have to go to great lengths to protect the State, to protect the people against the wiles and cunning of the defense lawyers in the Criminal Court. . . . If he can beat the chair in this case, all the boys in the county jail will all say he is a great lawyer, and will all hire him, so he will be very busy, that is all." Such argument cannot possibly aid the jury in weighing or evaluating the evidence, but tends only to arouse its antagonism against defendant and his attorney.

Further in the argument the State's Attorney said to the jury "I believe that any man who wilfully takes away the life of another, as this man took away Jerry Lebloch's life,—that his life should be forfeited. His life should be forfeited. And if you have any qualms about taking his life, put it on me, I will take it. I will take it any day in the week. I will take full responsibility for his life, and

if you give him the death penalty, blame me, because there never was a case like this in the criminal court, where a defendant deserves the death penalty more than this man deserves it. . . . There is only one verdict in this case, Ladies and Gentlemen, and as I said before, that if you have any feelings that you should not give the death penalty, give the responsibility to me. I will take it, because no case ever deserved it like this one." It is beyond the scope of proper argument to suggest that responsibility for a verdict of guilty or a death penalty may be placed upon the State's Attorney. The jury may not avoid the duty to form its own conclusion by taking the word of the prosecution on the matter of defendant's guilt, or by resolving any doubts it may have by considering the State's Attorney's willingness to assume responsibility. Statements suggesting or inducing it to do so are clearly improper and prejudicial. *People* v. *Black*, 317 Ill. 603.

Defendant also complains of the court's refusal to give five instructions tendered on his behalf; of the giving of several instructions alleged to be erroneous; of eight alleged errors in admitting incompetent and prejudicial testimony; of numerous remarks and rulings of the trial court which defendant contends showed prejudice against him; and of permitting the father of officer Loula to testify on rebuttal although he had been sitting in the courtroom during the trial in violation of an order excluding all witnesses. It is unnecessary, however, to consider these contentions, since the cause must be reversed for improper and prejudicial conduct of the prosecution, and since such further questions may not arise on another trial.

The judgment of the criminal court of Cook County is reversed and the cause remanded for a new trial.

*Reversed and remanded.*