(No. 35150.—

The People of the State of Illinois, Defendant in Error, *vs.* Marvin Dale Berry, Plaintiff in Error.

*Opinion filed February 11, 1960—Rehearing denied March 28, 1960.*

454

Austin Lewis, of Granite City, for plaintiff in error.

GRENVILLE BEARDSLEY, Attorney General, of Springfield, and DICK H. MUDGE, JR., State's Attorney, of Edwardsville, (FRED G. LEACH, Assistant Attorney General, and BURTON C. BERNARD, Assistant State's Attorney, of counsel,) for the People.

Mr. JUSTICE KLINGBIEL delivered the opinion of the court:

After trial by jury in the circuit court of Madison County, Marvin Dale Berry was found guilty of robbery while armed with a dangerous weapon. The court sentenced him to imprisonment for not less than 10 nor more than 20 years. He contends on this writ of error that he was deprived of a fair trial by improper remarks and conduct of the prosecutor, and by sickness on the part of certain jurors. It is also asserted that the evidence of identification is insufficient.

The record shows that on January 31, 1958, at about 6:15 A.M. three armed men wearing rubber head masks held up a tavern in Granite City and obtained the sum of $6,562 in currency, which had been kept on the premises for the purpose of cashing pay checks. A bartender, a porter and two customers were in the tavern when the robbers entered, and a third customer came in while the holdup was in progress. One of the robbers produced a light blue colored pillow case, into which he placed the money; and after telling the occupants of the tavern to remain inside, the three men left the tavern. It was still dark outside.

When the third customer had entered he noticed an unoccupied two-tone cream and cocoa colored Pontiac automobile, 1955 model, parked alongside the tavern with the lights out and the motor running. After the holdup the bartender went to a door at the north end of the building and saw a cream and brown colored Pontiac headed north. Later that morning a stolen 1955 model Pontiac, similar

to the car used by the holdup men, was found abandoned about five blocks away.

About 10 o'clock on the morning of the robbery an officer cruising about the city became suspicious when he observed a Buick automobile, bearing Missouri license plates, parked near an apartment which had been occupied by a man known to the police. The place was thereupon put under surveillance, and about 1:30 P.M. the defendant and one Forrest Alan Parker were observed leaving the apartment and getting into the car. They were taken into custody. A few minutes later, as the officers were still standing alongside the automobile, they observed some smoke coming from the apartment. After notifying the fire department, the officers ordered anyone who might be inside to leave the apartment. One Robert Emmett Burns then came out and was placed under arrest. Upon following the firemen into the apartment the police discovered that Halloween masks were burning in one of the rooms. The fire was extinguished with chemicals, and a search was made of the apartment. In addition to three partially burned rubber masks, there were found six pair of gloves, five pistols, a box of cartridges, and $6,637.07 in money. The greater part of the money was identified as that which was taken in the tavern robbery.

At the trial the bartender testified that the largest of the three men who held up the tavern was from six feet to six feet two inches in height, and weighed about 180 or 185 pounds; that he wore a full head rubber mask similar to those worn at Halloween time, which had black curly hair and an artificial mustache on it. He identified People's exhibit 32 (one of the masks discovered in the apartment) as being identical to it. He described the posture of the man as being slouched or slumped, with legs bowed slightly backward from the knees down, and after observing defendant in the courtroom, the witness testified that his general size and manner of standing were similar

to those of the largest of the holdup men. The bartender also identified gloves and jackets found in the apartment as being similar to those worn by the robbers, identified the pistols found in the apartment as similar to those used in the robbery, and stated that People's exhibit 41, a pillow case obtained from the apartment, was identical to the one into which the money had been placed.

Other testimony was introduced by the People tending to prove that at about 6:15 on the morning of the robbery the Pontiac was seen being parked where it was later found; that a man got out and entered another car which had approached the Pontiac; that the second automobile resembled the Buick which defendant and Parker entered just before their arrest; that defendant was well acquainted with the owner of the Buick; that he had been in the vicinity of the apartment prior to the date of the robbery; and that on January 28, 1958, three of the pistols found in the apartment had been purchased by defendant at a gunshop in Belleville, Illinois.

To prove an alibi defendant called one Amy Brown, his foster mother, who had raised him from early boyhood. She testified that defendant lived at her home during January, 1958; that after she had gone to bed on the evening of January 30 defendant came in about 9:30 P.M.; that when she awoke at 6:10 the following morning she saw defendant sleeping in the living room; and that when she left for work at 6:45 A.M. he was just getting up.

As his first assignment of error defendant maintains that the assistant State's Attorney made improper and inflammatory statements in his argument to the jury, depriving defendant of a fair and impartial trial. In relating details of the holdup the prosecutor exclaimed "Thank God, no one was killed in the process." He referred to defendant as a "leech" and a "contemptuous specimen of a human being," and remarked that they had "a finger man." He also directed comments to counsel for defendant, which

implied that the latter had resorted to trickery and attempts to confuse the issue. Most of these remarks were made with little basis in the evidence, and were objected to by defendant. It is not proper to make statements the only effect of which is to inflame the passions or arouse the prejudices of the jury, (*People v. Heidman*, 11 Ill.2d 501), nor should arguments be permitted which charge counsel with attempts to free the accused by trickery. (*People v. Freedman*, 4 Ill.2d 414.) In the instances noted the assistant State's Attorney in this case indulged in intemperate language and made comments which are subject to criticism. After examining them in their immediate context, and in the light of the nature and circumstances of the case, we think, however, that they are not sufficiently prejudicial to justify a reversal. Where it appears that improper remarks do not constitute a material factor in the conviction, or that they are of such a minor character that prejudice to defendant is not their probable result, the verdict will not be disturbed. (*People v. Stephens*, 6 Ill.2d 257; *People v. Jenko*, 410 Ill. 478; *People v. Coniglio*, 353 Ill. 643.) In this case the proof of guilt is overwhelming, and the verdict returned is the only reasonable conclusion to be reached on the basis of the evidence. The remarks complained of were not serious enough to constitute a material factor in defendant's conviction, and it is apparent that he could not have been injured by them.

Of an equally innocuous nature was the second breach of propriety of which defendant complains. It appears that after a noon recess of the trial, and before defendant and his counsel had re-entered the room, the assistant State's Attorney approached the jury box and asked the jurors as a group "How was the weekend?" There was a response to the effect that it was not too enjoyable, whereupon the prosecutor asked "Did it drag?" The jury indicated that it did, and one of them commented that they had no television. The prosecutor then inquired if they had a radio,

to which the juror said "Yes, but it was broken." At this point defense counsel entered the room, observed what was going on, and immediately objected. The judge had been on the bench at the time, but had been occupied signing orders and had not paid much attention to the incident. The content of the conversation was disclosed at a hearing held out of the presence of the jury. While the conduct of the prosecutor in thus speaking to the jury cannot be condoned, it is clear that it does not constitute reversible error. In order to justify setting aside the verdict of a jury because of an unauthorized communication with them, it is necessary to show the defendant was prejudiced. (*People v. Coniglio,* 353 Ill. 643.) Here there was no mention of the case or any part of it, nor has defendant suggested any other facts to show that prejudice resulted.

Complaint is next made that in questioning a police officer on redirect examination, the assistant State's Attorney elicited a statement implying defendant was involved in another crime. The officer had testified, on cross-examination by defendant's counsel, that two or three days after the date of the crime he had gone to the apartment with a deputy sheriff from Edwardsville, who examined clothing in a closet. To the question whether the latter was looking for any particular article of clothing, the witness replied "He was looking for something pertaining to a case in Edwardsville I am not familiar with." On redirect examination the prosecutor, over defendant's objection, was permitted to ask which case was referred to, and to elicit the answer "I think it was the Sanders case." In subsequent proceedings out of the presence of the jury an attempt was made by defendant's counsel to show that the matter to which reference was made was a murder investigation of some notoriety in the city of Edwardsville, where two of the jurors resided. The contention is that the statement elicited from the witness conveyed the impression that defendant was suspected of having committed another crime.

We cannot agree. While the testimony was not relevant to any issue in the case, and defendant's objection to the question should have been sustained, it does not have the effect asserted by defendant. The statement did not tend to show defendant's guilt of some other crime, and it cannot reasonably be inferred that the jury would so understand it. No prejudicial error has been shown.

Defendant also contends that the illness of two jurors during the course of the trial, and the long hours during which the jury was in session on the last day, prevented a full and fair consideration of the evidence and instructions. The contention is obviously without merit. Whether the condition of the jury is such as to require a new trial is a matter which lies largely within the discretion of the trial judge, who is present at the time and has opportunity for observation. The circumstances relied upon by defendant here afford no justification for a conclusion by this court that he was denied a fair trial. See *People* v. *Hanson,* 359 Ill. 266, 283-284.

The contention that the evidence is insufficient warrants little discussion. Although positive identification was impossible because the robbers' faces were covered with head masks, the evidence leaves no reasonable doubt of guilt. On the facts and circumstances proved in this case, the verdict returned is the only reasonable one which could be reached.

While the trial was not unattended by irregularities, we have carefully examined them and find none which could reasonably have affected the result. Where such is the case the judgment must be affirmed. (*People* v. *Sleezer,* 9 Ill.2d 57; *People* v. *Maurantonio,* 8 Ill.2d 60; *People* v. *Skelly,* 409 Ill. 613.) Defendant was clearly guilty of the crime, and his trial was free of prejudicial error. The judgment is accordingly affirmed.

*Judgment affirmed.*