THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EZELL RODGERS, Defendant-Appellant.

(No. 53627; )

First District—December 9, 1971.

*Rehearing denied January 13, 1972.*

McNAMARA, P. J., dissenting.

Gerald W. Getty, Public Defender, of Chicago, (George A. Lincoln and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Paul P. Biebel, Jr., Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE McGLOON delivered the opinion of the court:

The defendant, Ezell Rodgers, was found guilty by a jury of murder, (Ill. Rev. Stat. 1965, ch. 38, par. 9—1(a)), attempted murder, (Ill. Rev. Stat. 1965, ch. 38, pars. 8—4(a), 9—1(a)1), and armed robbery, (Ill. Rev. Stat. 1965, ch. 38, par. 18—2(a)). Rodgers was sentenced to the penitentiary for terms of from 75 to 100 years for murder, from 19 to 20 years for attempted murder and from 20 to 40 years for armed robbery, the sentences to run concurrently.

We affirm.

The facts, as testified to by Willard Ingersoll, the State's chief witness, are as follows: On November 7, 1965, Ingersoll was employed as an attendant in a gas station located at 1234 West Cermak Road, Chicago, Illinois. At approximately 6:30 P.M. on that date a truck was driven onto the station grounds in order that it might be weighed, the station being equipped with a truck scale. After the weighing, the truck driver, Harry Ganzen, left his truck and went into the stationhouse washroom. At about the same time the assailant, later identified as the defendant,

drove a car, identified as a maroon 1963 Oldsmobile sedan, into the station stopping at the pump area approximately 100 feet from the stationhouse.

The assailant came into the stationhouse and asked Ingersoll to fill his gas tank, check the oil and wipe the windows. Ingersoll went out to the car and proceeded to service it. As he was doing so, one Hugo Rodriguez, a fellow employee of Ingersoll who was off duty at the time, drove into the station. He walked to where Ingersoll was servicing the car. Rodriquez and Ingersoll walked back to the stationhouse where Rodriguez showed Ingersoll how to turn on the station's outdoor vapor lights.

At this time the assailant was in one of the phone booths inside the stationhouse. Rodriguez and Ingersoll went back outside. Rodriguez then departed in his car, and Ingersoll went back to finish servicing the Oldsmobile.

Being unable to locate the oil dipstick, Ingersoll came back to the stationhouse and asked the assailant where it was located. The assailant accompanied Ingersoll back to the car, pointed out the dipstick and went back into the stationhouse. All of the station lights were on at this time. Ingersoll finished servicing the car and returned to the stationhouse where he told the assailant what the bill would be. The assailant told Ingersoll that the bill would be charged, and he gave Ingersoll a charge card. Ingersoll informed him that such a charge was not acceptable, and the assailant pulled out a gun. Ingersoll put up his hands, and the assailant told him to put them down. The assailant walked him to the back of the stationhouse near the washroom area. All of the stationhouse interior lights were on at this time.

When Ganzen came out of the washroom, he saw the gun and lunged for it grabbing the assailant's arm. The assailant fired, and Ganzen fell to the floor mortally wounded.

The assailant told Ingersoll to go into the washroom and put his hands against the wall. The assailant then moved away from the washroom for one or two minutes and came back. Ingersoll heard another shot and started to turn around. The assailant then shot Ingersoll, the bullet penetrating his right eye. Ingersoll was hospitalized for a period of approximately three weeks, the result of the shooting being that he was blinded in his right eye. Ingersoll stated that he subsequently determined that a total of $190 in United States currency had been taken from the station consisting of $40 of his personal funds and $150 of the gas station's money.

Subsequent to his release from the hospital, Ingersoll and Rodriguez together gave a description of the assailant to the police in which the

assailant was described as being a Negro about six feet tall, weighing 160 pounds and having black hair, brown eyes, light brown complexion, being rather well dressed and wearing a hat. They further stated that the assailant had about one day's growth of beard, sunken cheeks with pock marks, Caucasian features and was approximately 45 to 50 years of age. This description, later repeated to a police artist, was the basis for the making of a composite sketch of the assailant by the police.

During the following months Ingersoll viewed many police photographs of possible suspects. He never identified any of these, although he did note that several exhibited facial characteristics similar to those of the assailant. On December 28, 1967, some two years after the homicide, a police detective came out to Ingersoll's home and showed him a picture of the defendant. The picture portrayed the defendant with a hat which had been drawn thereon by a police artist. Ingersoll identified the defendant's photo as being a picture of the assailant, and later that day he picked the defendant out of a police lineup consisting of five men. Ingersoll stated that at the lineup the defendant appeared worried and started bouncing on his feet. At defendant's trial Ingersoll made an in-court identification of the defendant. In addition, he testified as to the pre-trial lineup identification.

A summation of the testimony of Hugo Rodriguez concerning the facts is as follows: On November 7, 1965, at approximately 6:30 P.M. he drove into the gas station located at 1234 West Cermak Road, Chicago, Illinois, where he worked as an attendant. Alighting from his car, he went to turn on the outside station lights. Going inside the stationhouse, he first saw a Negro man in the phone booth; later he saw the same man standing on a stoop or raised platform on which the phone booths were located. He described the man as being between 45 and 50 years old, 160 pounds and about 6'2" tall and well dressed. He further stated that the man had "something dark, something on his face in the cheek area. He was a Negro, wearing a small hat and had pock marks on his face." After turning on the lights he went outside and over to the car on which Ingersoll was working. Rodriguez later identified the car as a maroon 1963 Oldsmobile "98." He then got back into his car and left.

Detective William Thompson's testimony can be summarized as follows: In December of 1965 he was investigating the Harry Ganzen homicide. Among other activities his police unit was assigned to locate the car used in the crime. He came upon a car matching the description parked on a street in Chicago. A check revealed it was registered to the defendant. Officer Thompson interviewed the defendant at his home and received the latter's consent to "go and look" at the car. At Thompson's request, but not under arrest, the defendant accompanied Thompson to

a local police station where he was photographed and questioned concerning his employment. He was then returned home by the police.

Officer Thompson stated that the defendant's photograph was taken for the purpose of having it viewed by the victim in the instant case. Nevertheless, he did not show it to Ingersoll or anybody else at that time. He stated he placed it in his personal police file where it remained until January 8, 1968, when he turned it over to Detective Sandburg who had visited Ingersoll on December 28, 1967, and shown him a picture of the defendant. (We note that the record is silent as to the origin of the picture shown to Ingersoll on December 28, 1967.)

Mr. Donald Tilton, the Collection Manager for an automobile finance company which had financed the purchase by the defendant of the automobile previously identified herein, testified as follows: In December of 1964 his company made an auto loan on a 1963 Oldsmobile "98" to the defendant which was to be repaid in 36 monthly installments of $87.54 each. The payments were due on the 10th of each month. From December of 1964 up to November of 1965 none of the payments were made on time. However, in November of 1965 two past due installments of $87.54 were paid by the defendant. No payment was made in December of 1965, and subsequently, in October of 1967, the car was repossessed and sold.

Mr. John Niesen, the retired manager of an industrial cafeteria, testified that through the end of 1965, when he quit, the defendant had been employed by Niesen for about two and one-half years. At the time of his termination, the defendant's net take-home pay was approximately $90 per week.

■■ On appeal one of the issues raised by the defendant is that the identification procedures involved here denied him due process of law. The thrust of his argument is that Ingersoll was shown a photograph of the defendant on December 28, 1967, which photograph was presented singly and with a hat drawn thereon. The hat served to create an added resemblance of the defendant to the assailant and thus suggestively induced the identification of the defendant's photo as that of the assailant.

In *Stovall v. Denno* (1967), 388 U.S. 293 the Supreme Court said at page 302:

"The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned. However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it,  *  *  *."

Individual "showups" under suggestive conditions have been held to

be a violation of due process. (*Biggers v. Tennessee* (1968), 390 U.S. 404.) Some exceptions to this are *Stovall v. Denno, supra,* where the confrontation was deemed "imperative" because of the critical condition of the only witness; *People v. Speck* (1968), 41 Ill.2d 177, 242 N.E.2d 208 where the witness had an excellent opportunity to view the defendant over a very long period of time; *People v. Robinson* (1969), 42 Ill.2d 371, 247 N.E.2d 898 where the defendant was known by the witness prior to the crime; *People v. Bey* (1969), 42 Ill.2d 139, 246 N.E.2d 287 where uncommon distinguishing characteristics were the principal means of distinction.

Whether a "confrontation" by means of a photograph of the defendant could, under the "totality of circumstances" test, be held to violate a defendant's right to due process was a question recently considered by the Illinois Supreme Court in *People v. Gersbacher* (1970), 44 Ill.2d 321, 255 N.E.2d 429 where photographs of the defendant were identified by the critically ill prosecutrix. The Court held that in view of the totality of circumstances there was no violation of due process. However, the Court said at page 324:

"But for the exigent situation confronting the police the pre-trial identification procedure here employed could have been questioned * * * *."

In *Simmons v. United States* (1968), 390 U.S. 377, photographs of the defendant were shown to the five witnesses to a bank robbery. All identified the defendant, and he was convicted although at trial only the in-court identifications of the witnesses were used. The defendant there argued that the identification procedure was so unduly prejudicial as to taint his conviction. The Court in *Simmons* recognized the potential for incorrect identifications with the use of photographs when such procedures were not carefully employed. Nevertheless, the Court was unwilling to set down a general prohibition of such identification procedures either in the exercise of their supervisory power over the federal courts or as a matter of constitutional doctrine. Rather, they said at page 384:

"Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pre-trial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. This standard accords with our resolution of a similar issue in *Stovall v. Denno,* 388 U.S. 293, 301-302, and with decisions of other courts on the question of identification by photograph."

The Court then examined the circumstances surrounding Simmon's identification and found no violation of due process.

In the instant case we are not convinced that this photographic identification procedure was "so unnecessarily suggestive and conducive to irreparable mistaken identification * * *" (*Stovall v. Denno, supra.*) While at the time of the identification only the defendant's picture was exhibited, it has to be remembered that in the time frame between the crime and the initial identification, Ingersoll had been presented with literally "thousands" of photos. Surely if the police were wont to "suggest" a culprit or Ingersoll anxious to "identify" just any face, such a happening could and would have occurred long before the identification of the instant defendant. Further, we cannot say that, given the facts of this case, that the addition of a hat to the defendant's picture was such a unique emphasis thereof as to create impermissible suggestion. Rather, such a practice appears in little or no way distinguishable from requiring a defendant appearing in person to wear specific articles of clothing. This latter practice was approved by this Court in *People v. Wicks* (1969), 115 Ill.App.2d 19, 252 N.E.2d 698; *cf. United States v. Fried* (1971), 436 F.2d 784.

■■ In light of our conclusion that the photographic identification was not violative of the defendant's right to due process, we will not say that the subsequent lineup identification was tainted thereby. The only possibility for error in the lineup procedure rested with the testimony of Ingersoll that during the lineup when the defendant saw Ingersoll he "was worried and started bouncing on his feet." The testimony that the defendant "was worried * * *" was stricken immediately, and we think this was sufficient to negate any claim of error. *People v. Williams* (1968), 98 Ill.App.2d 136, 240 N.E.2d 144.

The previous discussion regarding the pre-trial identification procedures leads us to conclude it was not error to admit this testimony along with the in-court identification of the defendant by Ingersoll. *People v. Covington* (1970), 47 Ill.2d 198, 265 N.E.2d 112.

With regard to the in-court identification, we must note that we entertain no doubt as to its admissibility. In *People v. McMath* (1968), 104 Ill.App.2d 302, 244 N.E.2d 330, affirmed by the Illinois Supreme Court in 45 Ill.2d 33, 256 N.E.2d 835 (1971), this Court said at page 313:

"If, however, the testimony does establish an unfair pretrial identification, the subsequent in-court identification may nevertheless be admissible if the State shows, by clear and convincing evidence, that such in-court identification had an independent origin, arising from uninfluenced observation of the defendant."

In *People v. Gates* (1970), 123 Ill.App.2d 50, 259 N.E.2d 631, the Court said at page 55:

"We have previously held that 'It should make no difference whether an identification procedure is or is not so unnecessarily suggestive so long as the record clearly shows a prior observation of the defendant sufficient to serve as an independent origin for the in-court identification.' *People v. Cook*, 113 Ill.App.2d 231, 239, 252 N.E.2d 29. See, also, *People v. Nelson*, 40 Ill.2d 146, 151, 238 N.E.2d 378; *People v. Blumenshine*, 42 Ill.2d 508, 250 N.E.2d 152; and *People v. McMath*, 104 Ill. App.2d 302, 312-13, 244 N.E.2d 330, affirmed 40 Ill.2d 388, 240 N.E.2d 593."

In *United States v. Wade* (1967), 388 U.S. 218 it was established that an in-court identification may stand despite the existence of an unconstitutional pre-trial identification if there is an independent origin to which the in-court identification may be attributed. The *Wade* decision mentions many factors which will be evaluated to determine the existence and validity of such independent source, including the opportunity of any witnesses to observe the defendant, failure to identify the defendant at a prior lineup and lapse of time between the crime and the idntification.

Looking to the case at bar, we find that Ingersoll's testimony indicates he had more than ample opportunity to observe his assailant. The assailant came into the lighted stationhouse and spoke to Ingersoll when he requested that service be given his car. Later he walked with Ingersoll the 100 feet from the station to his car to point out the location of the oil dipstick, and finally he spent several minutes conversing with Ingersoll back in the stationhouse during the course of the actual crime. Testimony indicates that the station area was well lighted, and there is nothing to indicate Ingersoll's powers of observation were in any way limited.

With regard to the other factors mentioned in the *Wade* case, *supra*, we see that there was no failure to identify the defendant at the pre-trial lineup conducted in this case. As for the time lapse between the crime and the identification, we are acutely aware that the two year span in the instant case is a stern test for any memory. However, our Supreme Court in the recent case of *People v. Martin* (1970), 47 Ill.2d 331, 265 N.E.2d 685 spoke to just such a problem. There the Supreme Court upheld an armed robbery conviction in the face of defendant's claim that his in-court identification was the product of pre-trial identification procedures which were so suggestive as to give rise to a substantial likelihood of irreparable mistake and thereby violated his right to due process.

In the *Martin* case, *supra*, as in the case at bar, there was a sixteen

month time lapse between the crime and a pre-trial photographic identification of the defendant and a two year lapse from the crime to the in-court identification at trial. The Court speaking at pages 338-9 said:

"We recognize that much time elapsed between the crime and the trial and that time tends to fade memories. But this too is dependent on the circumstances under which the witnesses observed the robbers at the time of the crime. Here the robbers made no effort to conceal themselves by masks or otherwise. They spent a leisurely one-half hour in the tavern ordering drinks and playing the bowling machine. As we noted previously, the tavern was adequately lighted enabling witnesses to obtain a clear view. Considering all the circumstances together, particularly the opportunity and length of time the witnesses had to observe defendant, the close and frightening contact with him that two of the witnesses experienced, and the general agreement of all witnesses as to his color of hair and other physical characteristics, there is little room for doubt that the identification of the defendant was correct notwithstanding the fact that the out of court procedures employed were highly questionable * * *."

A similar analysis of the instant case would lead to the same result. The assailant here was unmasked and spent many minutes in the station. Ingersoll's view was unobstructed and aided by the full lighting in the station. The descriptions of Ingersoll and Rodriguez were in general agreement. In summation, in reviewing all the factors, we think it can be said there was a sufficiently independent source to support Ingersoll's in-court identification of the defendant. See *People v. Blumenshine* (1969), 42 Ill.2d 508, 250 N.E.2d 152.

● 3    The last argument put forth by defendant in support of his claim of denial of due process is that he had a right to counsel at the pre-trial lineup and was denied such right. There is no merit to this argument. The law in Illinois was set forth in *People v. Palmer* (1969), 41 Ill.2d 571, 244 N.E.2d 173. There the Illinois Supreme Court expressly recognized that the right to counsel at a lineup, as provided by the *Wade* case, *supra*, was limited to post-indictment situations. The holding of the *Palmer* case on this point was recently followed by this Court in *People v. Davis* (1970), 126 Ill.App.2d 255, 261 N.E.2d 771.

■■    The next issue raised by the defendant is that his identity as the guilty party was not proven beyond a reasonable doubt, and argues that it was only ownership of a particular car which made the defendant a "suspect" in the crime, and that in view of the mass production in the auto industry, mere ownership of this car has little tendency to prove guilt. This argument must fail. The defendant has linked two entirely separate points. To say that mere ownership of a car was determinative

of guilt in this case ignores the rather lengthy eyewitness testimony as well as the other evidence that was introduced. As for the defendant's being a suspect, suffice it to say that it is irrelevant in what manner defendant comes under suspicion providing any further exercise of the criminal process meets necessary legal standards.

■■ The defendant further argues that the testimony of different state witnesses demonstrates that the defendant was not the assailant. The testimony to which the defendant has reference in his argument on this issue is that of Hugo Rodriguez. Rodriguez testified on cross-examination by defendant's counsel that when he saw the assailant on November 7, 1965, "* * * he appeared to be 6 foot or 6 foot 2." He also testified on cross-examination that, "I am not positive that the defendant is the man I saw in the phone booth." On redirect examination he said, "I saw the man standing on the stoop. The man looked like Ezell Rodgers * * *. When I say that I am not positive that this is the man, I am not saying that this is not the man." The defendant argues that the difference in this testimony from the testimony of Ingersoll, who positively identified the defendant as the assailant, creates a reasonable doubt as to the identity of the defendant.

This argument we do not accept. While it is true that the identification of the defendant by Rodriguez was not as positive or complete as that of the eyewitness, Ingersoll, it is also true that those details which were recalled by Rodriguez did corroborate in substance the positive identification by Ingersoll.

■■ Our courts have consistently held that identification by one eyewitness will be sufficient to support a conviction without further corroboration. *People v. Martin* (1968), 95 Ill.App.2d 457, 238 N.E.2d 205; *People v. Moore* (1969), 42 Ill.2d 73, 246 N.E.2d 299.

■■ The defendant also argues in support of this issue that the two year time lapse between the date the crime occurred and defendant's subsequent identification made a positive identification impossible. One obvious reason why Ingersoll did not identify the defendant earlier was that he was never shown a picture of the defendant prior to December 28, 1967. The fact that Ingersoll had viewed and rejected a great many photographs would support the premise that he had a very clear mental picture as to how his assailant looked. In *People v. Coli* (1954), 2 Ill.2d 186, 117 N.E.2d 777, the Court said that lapse of time affects only the weight to be given the identification and does not make the identification unworthy of belief *per se*. We think that the language of the *Coli* decision is applicable to the identification of the defendant by Ingersoll.

■■ The defendant further argues that since his initial description by Ingersoll did not match the description of the defendant, there was a

reasonable doubt created as to his identity. The argument has reference to the initial description of the assailant given by Ingersoll which we earlier set out. The defendant's conclusion is that the variance in age (defendant was approximately 34 years old at the time of trial) between the description and the defendant's actual age coupled with the fact that defendant has a wide nose and thick-set lips which are not, generally speaking, Caucasian features created the reasonable doubt.

On cross-examination Ingersoll testified:

"Q. And what was it, if you recall, will you state, please? (Referring to Ingersoll's previous description of the assailant.)

A. Six foot, 150 pounds, medium complexion, I mean, sort of light for a colored person, he had Caucasian features, he had about one day's growth of beard, he had sunken cheeks with pockmarks, pretty well dressed but not real fancy, and he had a hat on.

Q. Now, when you said he had Caucasian features what did you mean?

A. His ears, they weren't flattly pressed down and he didn't have such a large nose and his lips, they weren't that thick.

Q. Would you stand up Mr. Rodgers? Would you look at this man today, does he have a large nose?

A. Well, his nose, it isn't that large.

Q. And is he six feet tall? (Here there was an objection which was overruled.)

A. About 6 foot.

Q. Would you say his lips are not large?

A. Not real large."

We think this was adequate to dispel any claim that such description was inconsistent with the actual appearance of the defendant. It cannot be overlooked that Ingersoll's description of defendant's facial characteristics was corroborated in every respect by the description given by Rodriguez. Further, variance in age between the original estimate by Ingersoll and the actual age of the defendant cannot be deemed sufficient to sustain a claim of reasonable doubt. Age is among the most elusive physical characteristics to gauge. Ingersoll was only 17 years old at the time of this crime, and from his youthful perspective, it would not be unusual that he would fail to describe any adult's precise age. See *People v. Barnes* (1969), 118 Ill.App.2d 128, 255 N.E.2d 18.

■■ Finally, the defendant argues that his identification by Ingersoll was a product of suggestion. The police came to Ingersoll's home, showed him only one picture, that of the defendant, which picture had a hat similar to the one allegedly worn by the assailant drawn thereon. From this defendant claims that Ingersoll was unfairly influenced in identifying

the defendant. The defendant concludes that as a result of these happenings, it cannot be said the defendant's identity was proven beyond a reasonable doubt. We do not accept this argument.

In our earlier discussion we indicated that the in-court identification by Ingersoll was sufficiently supported by factors independent of any pre-trial identification regardless of whether the latter identification was suggestive or not. This in-court identification was unequivocal and sufficient to establish the guilt of the defendant beyond all reasonable doubt. See *People v. Cook* (1969), 113 Ill.App.2d 231, 252 N.E.2d 29; *People v. McMillan* (1970), 123 Ill.App.2d 232, 260 N.E.2d 70.

■■ The third and final issue raised by the defendant is that he was denied a fair trial. In support of this contention he urges that the trial court erred in not allowing a police detective, when called as a defense witness, to testify as to the description of the assailant given by Ingersoll and Rodriguez some three weeks after the crime.

At the stage of the trial where defendant sought to have this testimony introduced, both Mr. Ingersoll and Mr. Rodriguez had already testified. The record stands uncontradicted that defendant had this report in his possession and had adequate opportunity to use it during cross-examination of both Ingersoll and Rodriguez. His failure to use their joint statement to properly impeach their testimony cannot later be raised in support of his claim that defendant was denied a fair trial.

The defendant further claims that he was denied a fair trial in that the prosecutor made improper remarks to the jury. He refers to the fact that the prosecutor, at one point during the trial, said, "I don't know what counsel is trying to hide from the jury." The other remark occurred later in the trial after defense counsel had argued: "And I submit to you ladies and gentlemen, that there, in the Chicagoland area are probably and was probably literally thousands of 1963 maroon Oldsmobiles. There are a lot of Oldsmobiles on the street, many." The prosecutor objected, saying: "And if counsel insists we could show that there is less than 100, if he is going to testify."

The defendant argues that the former remark implied to the jury that he was trying to hide the truth and the latter remark indicated to the jury that the prosecution could in fact produce such evidence concerning the car and hence was an argument not based on any evidence produced at trial.

■■ Regarding the admissibility of alleged improper remarks, the Illinois Supreme Court has said:

"Where it appears that improper remarks do not constitute a material factor in the conviction, or that they are of such a minor character that prejudice to defendant is not their probable result, the verdict will not

be disturbed * * *." *People v. Berry*, 18 Ill.2d 453, 458, 165 N.E.2d 257 (1960).

The cases cited by the defendant in support of his position are distinguishable as situations where either the remarks were frequently made in the face of repeated objections as in the cases of *People v. Polenik* (1950), 407 Ill. 337, 95 N.E.2d 414 and *People v. Freedman* (1954), 4 Ill.2d 414, 123 N.E.2d 317 or where remarks specifically prohibited by law such as comment on the failure of a defendant to testify, which was the situation in *People v. Munday* (1917), 280 Ill. 32, 117 N.E. 286.

■■ We do not condone such remarks as these. Nevertheless, we think that the prompt action of the trial judge in giving cautionary instructions to the jury that they should disregard the remarks removed the possibility of prejudice and rendered them harmless. *People v. Farmer* (1963), 28 Ill.2d 521, 192 N.E.2d 916.

■■ The defendant next argues that irrelevant and inflammatory testimony was admitted into evidence. He has reference to the fact that Ingersoll was allowed to testify to the extent of the injuries he incurred as a result of being shot by the assailant. Specifically, Ingersoll was allowed to testify over objection: "I have no sight in my right eye."

The defendant cites the case of *People v. Nickolopoulos* (1962), 25 Ill.2d 451, 185 N.E.2d 209 which involved a charge of assault with intent to commit murder. There the Illinois Supreme Court disallowed testimony of the bleeding of the victim on the floor on a stretcher and the fact that he had to be fed intravenously and had tubes down his nose and that he had been paralyzed since the assault with "seven holes in his intestines." Defendant contends that this case is controlling even though in the case at bar the defendant is charged with attempted murder and not assault with intent to kill. Defendant argues that under the present Illinois Criminal Code, the offense of attempted murder is substantially the same in terms of its necessary requirements as the pre-1961 offense of assault with intent to murder. See Ill. Rev. Stat. 1969, ch. 38, pars. 8—4, 9—1(2); Ill. Rev. Stat. 1959, ch. 38, par. 58.

Even were we to agree with the defendant's statutory construction we find the *Nickolopoulos* case and the other case cited by him, *People v. Carpenter* (1964), 49 Ill.App.2d 101, 199 N.E.2d 457, to be distinguishable. In the case of *People v. Cunningham* (1966), 73 Ill.App.2d 357, 218 N.E.2d 827, which the Court reversed on other grounds, the *Nickolopoulos* case was cited by the defense, and the State argued successfully that the latter case was distinguished by the fact that it was the gruesome aspects of the crime which were emphasized therein. In the *Cunningham* case, as in the case at bar, there was a simple brief explanation of the extent of the defendant's injuries. To see that such testimony is both relevant

and admissible in a case involving attempted murder, we again look to the *Cunningham* case. The Court there said at page 364:

"The indictment in this case stated that defendant took a substantial step toward commission of the offense of murder by shooting and wounding James Officer. The extent of wounds of James Officer were, therefore, clearly relevant in the case since the nature of the wounds and their location might be significant in determining whether or not the shooting and wounding was an attempt to kill * * *."

The location of Ingersoll's wound, coupled with the relevant testimony, would seem to clearly indicate that the assailant intended to kill him.

The case of *People v. Taylor* (1968), 95 Ill.App.2d 130, 237 N.E.2d 797 cited by the defendant is not pertinent to the discussion in that the issue there was whether or not the evidence established that the defendant had the requisite intent required by the statute.

■■ Finally, the defendant contends that the trial court committed prejudicial error when it admitted evidence concerning the defendant's car payments. The evidence admitted was previously summarized herein as the testimony of Mr. Donald Tilton and Mr. John Niesen.

The defendant argues that since the State offered this testimony as evidence of motion, it was inadmissible. He argues it was irrelevant as to motive and inadmissible for any other purpose. He argues further that before such testimony can be admitted it must be established first that the party involved has made a "sudden acquisition of wealth," and secondly, that such party was impecunious before the crime but was not so afterwards.

We do not agree. Sudden acquisition of wealth is a relative matter. It is not always limited to a situation which could be characterized as "rags to riches." All the circumstances at hand must be considered. Here the defendant had a definite pattern of making his car payments late. Subsequently, the car was repossesssed. These facts would clearly indicate that he was experiencing financial problems of some degree. Yet in one month he applied almost half of his net take-home pay to car payments. A definite and improbable inconsistency has arisen. We conclude that such evidence was relevant and was properly admitted as a part of the State's theory of the case, a theory that is uncontradicted and undenied in the record. Its sufficiency was a matter of weight for the jury to determine. See *People v. Nicholson* (1965), 55 Ill.App.2d 361, 204 N.E.2d 482.

For the reasons stated, the conviction of the defendant is affirmed.

Judgment affirmed.

DEMPSEY, J., concurs.

McNAMARA, P. J., dissenting:

I cannot agree with the majority's conclusion that the testimony concerning the pretrial identification of defendant was admissible in evidence. The in-court identification of defendant by Ingersoll based upon an independent origin was properly introduced into evidence. However, where the pretrial confrontation was tainted, the prosecution may not under any circumstances introduce in-court testimony concerning that pretrial identification. (*United States v. Wade* (1967), 388 U.S. 218; *Gilbert v. California* (1967), 388 U.S. 263. Testimony about the pretrial identification "is the direct result of the illegal lineup 'come at by exploitation of [the primary] illegality'". *Gilbert v. California, supra.*

It seems clear that the pretrial identification procedure in the instant case was conducted in a suggestive manner and in violation of the defendant's rights under the sixth amendment. Some two years after the crimes in question, a police officer visited the victim at his home and showed him a single photograph, that of defendant. Before it was shown to the victim, the photograph had been altered by a police artist who had drawn a hat on the photo to reflect the type of headgear worn by the assailant. The victim then identified defendant from the photograph, and a few hours later identified him at a police station lineup. I believe that the photographic identification procedure used was impermissively suggestive and tainted the entire pretrial confrontation. This is especially true when it is remembered that the police department had in its possession an undoctored photograph of defendant taken shortly after the crime. Indeed, that photograph of defendant was taken by a police officer for the purpose of viewing by the victim; however the failure to show it to Ingersoll was never explained. That unaltered photograph, taken at a time when defendant voluntarily went to the police station, could well have been shown to the victim along with photographs of other suspects. Thus it was error to permit the victim and the police officer, over defendant's objection, to testify concerning the lineup identification. The error was compounded when the officer was also permitted to testify that defendant appeared upset at the lineup, and when both witnesses were allowed to testify that defendant started bouncing on his feet in concern upon seeing the victim at the lineup. In a case so close, where one of the eyewitnesses was unable to identify defendant at trial and in view of the fact that two years had elapsed between the occurrence of the crimes and identification of defendant, I believe that the testimony of the victim and the police officer concerning the lineup constituted prejudicial error. I, therefore, would reverse the judgment of conviction and remand the cause for a new trial.