**People of the State of Illinois, Plaintiff-Appellee, v. Golden McMath, Defendant-Appellant.**

**Gen. No. 51,569.**

First District, Fourth Division.

December 31, 1968.

303

Gerald W. Getty, Public Defender of Cook County, of Chicago (Shelvin Singer and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Alan S. Gersh, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

OFFENSE CHARGED
Robbery. Ill Rev Stats (1963), c 38, § 18–1.

DEFENSE AT TRIAL
Alibi.

JUDGMENT
After a jury trial, defendant was found guilty and sentenced to a term of 5 to 15 years.

POINTS RAISED ON APPEAL
(1) The voice and physical identification procedures employed by the police prior to trial, were so unfairly suggestive that the defendant was denied a fair trial.

(2) Impeachment through silence of the key defense witness was improper because it was not preceded by a proper foundation.

EVIDENCE

*Mrs. Lovada Walker,* for the State

She is sixty-one years old and lives at 9630 South Wentworth Avenue. On May 21, 1965, at 4:50 a. m., she left her home and began walking north on Wentworth Avenue when a man with a stocking cap over his face stopped her at pistol point and said, "Do as I say to do. I won't hurt you." The man snatched her purse, containing her identification and wallet, and fled down an alley. In the early daylight, she noticed that the man wore a dark zipper jacket and a gray hat. (The witness identified a gray hat as the one which her assailant had worn at the time of the robbery. She also identified her purse and wallet.) She then ran to a service station at 95th and La Salle Streets, where she had the attendant call the police.

Shortly thereafter, police arrived at the service station with her purse and wallet and defendant was with them. At the service station, she was able to identify defendant as her assailant by his voice, height, and build.* At that time, defendant did not wear the mask. She said nothing to him. After she identified him, they took her to the hospital, where she received first aid for her hands and knee. She saw defendant again at the police station, where the police had him place a stocking mask over his face and speak the words used during the incident. She identified him by his height, build, shape of face with the mask on, and by his voice. She was never asked to make a comparative identification of defendant.

---

* This statement appears in the record, but was not included in defendant's abstract.

305

*Police Officer Lawrence Tobuck,* for the State

Shortly after 5:00 a. m. on May 21, 1965, he saw defendant driving an automobile at excessive speed. He and his partner, Earl Davy, followed the car for several blocks, during which time defendant drove west, north, west and south. The police car had its spotlights on and Mars light flashing, and they caught him when defendant's car struck a parked car on the left side of the street. Defendant immediately jumped out of his car, and so did the police.

On confronting defendant at his car, Tobuck noticed on the front seat a toy cap pistol, a gray hat, and a stocking cap. He then noticed a purse lying in the gutter just below the driver's door of defendant's car. The purse contained Mrs. Walker's identification.

After checking with headquarters, he learned of a robbery at 95th and La Salle Streets of a person named "Walker." They drove to the service station, where Mrs. Walker described her assailant as a man in a gray hat, gray pants, and gray jacket, wearing a stocking mask and carrying a small barrel chrome gun. When apprehended, defendant was wearing light rim glasses, gray hat, short gray jacket, blue trousers, and black shoes. As she described the assailant, defendant repeated, "She can't identify me."

Upon taking defendant to the police station, defendant explained that a man stopped him at 95th Street and Wentworth and asked him for a ride, which he gave him. The man then left the car, and defendant drove away. Defendant said he had returned to the spot where the man had gotten out of the car when the police followed him. Defendant claimed the toy gun was usually hanging as an ornament from his rearview mirror, but it had fallen off two days before.

At the police station, defendant was confronted with Mrs. Walker and was told to put on a stocking mask, which defendant did. Defendant then, upon police instruc-

306

tion, said, "Give me your purse," whereupon Mrs. Walker stated that he sounded and looked like the offender. This was the first time she had made such a statement to identify defendant.

*Police Officer Earl Davy,* for the State

He is a partner to Officer Tobuck. He corroborated Tobuck's testimony as to the circumstances of the stopping of defendant. Defendant, after leaving his car, tried to push something under it. Officer Tobuck retrieved it and found it to be a purse belonging to "Walker." After they arrested defendant, they asked him about the robbery. He said he didn't commit it, and that a man he had picked up had dropped the purse.

They took defendant to the service station to see Mrs. Walker. Upon arrival, defendant ran up to her repeating, "I didn't do this." He was put in the squad car and they questioned Mrs. Walker. She said she didn't know what her assailant looked like because he was wearing a mask. She described him as 5' 7", a husky build, and wearing gray clothes (short jacket, pants, and hat). When asked if defendant was the man, she answered that she was not sure, since the assailant was wearing a stocking mask, and she couldn't really say that he was the man who robbed her.

At the police station Mrs. Walker was confronted with defendant wearing a stocking cap pulled over his head, a gray hat on his head, and a toy pistol in his hand. He repeated, "Give me your purse." She then stated that defendant was the one; she knew by his voice. Another officer had put the stocking mask on defendant.

The purse, wallet, cap, stocking mask, and gun were admitted into evidence.

*Luther Weatherby,* for the defense.

He was employed at a Clark Gas Station at 11137 South Vincennes. On May 21, 1965, he saw defendant at his gas station washing his car some time after 12:30

a. m. Defendant was at the station for about half an hour.

*Roy Dixon,* for the defense

He is a construction worker who lives at 7755 South Normal. He has known defendant for 12 or 13 years. He last saw defendant on May 21, 1965, after 4:00 a. m., but some time before 5:00 a. m. when he was driven home by defendant.

*Lonnie Sutton,* for the defense

He was employed between midnight and 8:00 a. m. at the Shell Station at 95th and La Salle Streets. He was acquainted with defendant who hung around the gas station a lot. He saw defendant on May 21, 1965, at about 4:55 a. m. when he came to the station for gas. They chatted for a short while, and defendant left at about 5:10 a. m. He noticed the time because he was expecting a relief man who comes on at 5:30 a. m.

About 5:15 that morning, Mrs. Walker ran into the service station, told of the robbery, and asked him to call the police. Soon after, the police arrived with defendant in the back seat of their car. At the service station, the police asked Mrs. Walker whether defendant was her assailant. She said she didn't want to make a mistake and didn't believe that defendant was the man. The police did not tell defendant to go home. Sutton knew they were investigating defendant for a robbery, but because the police didn't ask him, he did not tell them that defendant could not have committed the robbery since he had been at the service station at 4:55. Before testifying, he had not told this to anyone but defense counsel.

*Mary McMath,* for the defense

She is defendant's mother. She was familiar with his car, and said that he used a toy gun in the car for his stick shift. He also frequently wore women's stockings, like the ones found in his car, to cover his head.

*Gritts McMath,* for the defense

He is defendant's younger brother. He knew that defendant kept toy pistols in his car which were used for decoration. Defendant owned three or four stocking caps which he often wore.

*Golden McMath,* defendant, on his own behalf

He was employed at Ingersoll Products as a punch press operator, with hours from 4:00 p. m. to midnight. On May 21, 1965, he left work at midnight, slept for a while at home, and then went to the Clark service station about 4:00 a. m. He washed his car there and saw Luther Weatherby at the time. He also saw Roy Dixon there, and drove him home at about 4:20.

Two or three minutes before 5:00 a. m., he stopped to get gas at the Shell Station located at 95th and La Salle Streets. He noted the time on his watch. After talking for eight or ten minutes with Lonnie Sutton, defendant left the station and proceeded west on 95th Street. Two blocks west of La Salle, defendant was flagged down by a man with a shopping bag and a coat lying over it. Thinking the man to be a friend, he stopped the car and the man got in. He was offered $3 to give the man a ride to 99th Street and Halsted. He described the man as 5' 7" tall, having dark coloring, and wearing a dark jacket with an emblem on it, blue trousers, cushion shoes, and a greenish hat. The man was let off between 96th and 97th Streets on Emerald and there discarded the handbag. He was curious, so he circled the block to the spot where the handbag was dropped. He did not notice the police car or see its light until he had stopped and the police were approaching his car. The handbag was about two feet from where he was standing and he became afraid when the officers spotted it, so he kicked it.

The police then were told by radio of the robbery in the vicinity and took him to the Shell Station at

95th and La Salle Streets. He told the police about the man to whom he had given a ride. He also requested a chance to talk to Mrs. Walker to show that he had nothing to do with the handbag. When confronted with Mrs. Walker, she told the policemen that he appeared to be the same height, color, and slender, but she wasn't certain. One of the policemen then went to the car, got the bag, and said, "Come on lady, we got the guy red-handed. . . . Here is the mask and here is the pistol." The policemen then brought him handcuffed before Mrs. Walker and put on a stocking cap that fit over his face. Then the police told her to come to the police station.

He was taken to the police station and handcuffed to a chair. He was questioned, and one of the officers said, "We got you this time." The police told Mrs. Walker, "Come on lady, we got the guy here with the evidence right here." She said the man had a mask on. Officer Bradshaw then took defendant's hat off and forced a stocking over his face. He said, "Isn't that a mask? He had the pocketbook, that has to be him." Mrs. Walker then left the room. There was no lineup.

He kept about three stocking caps in his car which he wore around the house and when he was dressed up to go out, while driving in the car on the way. He also had some toy pistols in the car which he used on his stick shift and as an ornament hanging from his rearview mirror.

In 1966 he was convicted of rape and served nine years in the penitentiary.

OPINION

(1) Defendant contends that the methods used by the police to obtain an identification of defendant were unnecessarily suggestive, thus constituting a denial of due process of law; and that as a result, the in-court identification was so highly prejudicial as to deprive defendant of a fair trial.

310

On June 12, 1967, the Supreme Court decided United States v. Wade, 388 US 218, Gilbert v. California, 388 US 263, and Stovall v. Denno, 388 US 293. All three cases dealt with the question of pretrial identification— specifically, the police lineup. The Wade and Gilbert cases held that a post-indictment lineup was a critical stage of the prosecution and that defendants were then entitled to the assistance of counsel; that the admission into evidence of a subsequent in-court identification of the defendant would amount to reversible error if it was based on a lineup conducted in the absence of counsel; but that if it is established that the in-court identification was a harmless error, or, more importantly, had an independent origin or source, a conviction dependent thereon would be permitted to stand. The Stovall case followed, holding, in part, that the rule of the Wade and Gilbert cases had application only to cases involving confrontations for identification purposes conducted after the date of the decision (June 12, 1967).

Stovall v. Denno, 388 US 293, concerned a defendant who was arrested for the stabbings of a married couple, resulting in the death of the husband. The next day the defendant was arrested, and, before he had the opportunity to obtain counsel, he was handcuffed to a policeman and taken before the hospitalized wife to be identified. After seeing him and hearing his voice, she said he was the murderer of her husband, and, at his trial, she identified him for the jury. In the second part of the opinion, the Supreme Court ruled that confrontations for the purpose of identification may be so unnecessarily suggestive and conducive to irreparable mistaken identification that the accused is denied due process of law. The court noted that the practice of showing suspects singly to victims of crime for the purpose of identification, and not as part of a lineup, has been widely condemned, but explained that such a claimed violation of due process of law "depends on the totality

311

of the circumstances surrounding it." (388 US 293, 302.) In Stovall, the facts, as reflected in the record, revealed that the confrontation had not violated due process, and the court affirmed the conviction, citing Palmer v. Peyton, 359 F2d 199.

The Supreme Court of Illinois adopted this application of due process to pretrial identification in People v. Nelson, 40 Ill2d 146, 238 NE2d 378. In that case, the defendant was arrested in 1965 for the illegal acquisition of drugs. After the arrest, there was an attempted lineup composed of the defendant and several other men of similar appearance. The defendant called his attorney and refused to appear in the lineup. The witnesses, druggists who had sold narcotics to the defendant, were told that the defendant refused to appear, and they were led past both the lineup and the defendant, who was sitting nearby and trying to conceal his face. It came out at trial that the witnesses were acquainted with the defendant before the arrest. The court, in recognition of Stovall, affirmed the conviction because, on the totality of the surrounding circumstances, the evidence did not disclose that the confrontation was so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny due process. On the other hand, the evidence did disclose that the courtroom identification of the defendant was independent of and uninfluenced by any viewing at the attempted lineup. (40 Ill2d 146, 151–152, 238 NE2d 378.)

■ ■ It appears to us from the cases cited that in an attack by a defendant on the admissibility of an in-court identification, it must be shown, first, that the pretrial identification confrontation was, under the circumstances, so unnecessarily suggestive and conducive to irreparable mistaken identification that the defendant was denied due process of law. See Palmer v. Peyton, 359 F2d 199. If such great unfairness is not demonstrated by the evidence, then the fact that the

312

pretrial confrontation was not made in a lineup becomes a question of the weight to be given it by the jury, and does not serve to raise any question as to the admissibility of the in-court identification. People v. Crenshaw, 15 Ill2d 458, 155 NE2d 599; People v. Boney, 28 Ill2d 505, 192 NE2d 920; People v. Washington, 26 Ill2d 207, 186 NE2d 259. See also People v. Caruso, 65 Cal Rptr 336, 436 P2d 336, 341. If, however, the testimony does establish an unfair pretrial identification confrontation, the subsequent in-court identification may nevertheless be admissible if the State shows, by clear and convincing evidence, that such in-court identification had an independent origin, arising from other uninfluenced observation of the defendant. People v. Caruso, 65 Cal Rptr 336, 436 P2d 336; People v. Ballott, 20 NY2d 600, 286 NYS2d 1, 233 NE2d 103.

 This latter situation is the one which we believe exists in the case now before us. Defendant was twice brought alone before Mrs. Walker. Looking, first, to the station house "showup," we observe that in Illinois there has been no requirement that an accused must be placed in a lineup for the purpose of testing the ability of a witness to identify him. People v. Crenshaw, 15 Ill2d 458, 464, 155 NE2d 599; People v. Boney, 28 Ill2d 505, 509, 192 NE2d 920. Stovall v. Denno, supra, has modified this view only to the extent that, since a one-man showup may be highly prejudicial, it therefore must be carefully scrutinized to determine the fairness of the identification. At the police-station confrontation on the day of the robbery, defendant in the instant case was the lone suspect in a room with several policemen. The officers had defendant dress in a stocking cap covering his face, a gray hat on his head, and a toy pistol in his hand. He repeated several expressions used by Mrs. Walker's assailant. At that time, she made a positive identification. We feel that the facts and circumstances of this identification were un-

313

fairly suggestive. Stovall v. Denno, supra; Palmer v. Peyton, 359 F2d 199; People v. Ballott, 20 NY2d 600, 286 NYS2d 1, 233 NE2d 103.

 Mrs. Walker, however, had previously observed defendant at the time of the crime, and had been able to identify him at the service station. We believe that these facts, as reflected in the record, disclose a sufficiently independent and uninfluenced origin or source to stand as the basis for the courtroom identification. There is some conflict in testimony as to the sufficiency of the identification at the service station; however, there was testimony which, if believed, showed that her recognition of defendant was sufficient to satisfy her that he had been her assailant. The police considered it sufficient identification to keep defendant under arrest, and Mrs. Walker testified that she was able to identify defendant at that time by his height, voice, and slender build. All evidence of this sort is, of course, subject to cross-examination. A positive identification by one credible witness can be sufficient for conviction, though contradicted by the accused. People v. Boney, 28 Ill2d 505, 192 NE2d 920; People v. Washington, 26 Ill2d 207, 186 NE2d 259; People v. Thompson, 406 Ill 555, 94 NE2d 349; People v. Haywood, 72 Ill App2d 109, 218 NE2d 790. Here, also, the testimony of the two police officers concerning the circumstances of the arrest of defendant, together with the recovery of the purse, and the finding of the stocking caps and gun, furnish a strong measure of corroboration.

(2) Defendant also contends that there was unfair and improper impeachment of the key alibi witness for the defense, Lonnie Sutton. Defendant claims that several times during cross-examination an attack was made on Sutton's credibility which was prejudicial because not preceded by a proper foundation. In this line of questioning, the State's Attorney asked Sutton if he had told the police that defendant had been in his ser-

vice station at the time of the robbery. The witness said that he had not, because they had not asked him that. This testimony was also referred to by the prosecutor in his closing argument.

■ ■ Conduct may be contrary to testimony and serve as the foundation for impeachment. It must be shown that the witness had an opportunity to make a statement, and that, under the circumstances, a person would normally make a statement. In the present case, the prosecutor argued that the failure of Sutton to speak in defendant's defense at the service station was an indication contrary to his extensive alibi testimony at trial. We feel that the prosecutor's tactic here was permissible. The four cases cited by defendant support, rather than negate, this proposition. Larrance v. People, 222 Ill 155, 78 NE 50; People v. Boulahanis, 394 Ill 255, 68 NE2d 467; People v. Svizzero, 84 Ill App2d 251, 228 NE2d 604; and People v. Yocca, 84 Ill App2d 423, 228 NE2d 599.

■ The prior silence in question before us arose from the conversation of the witness with police officers at the time of the initial confrontation between defendant and Mrs. Walker. Sutton knew that there had been a robbery and had even placed the call to the police as soon as he had learned of it. When the police arrived, he had discussed the robbery with them and knew that they were investigating it. He had seen defendant in the rear of the squad car and knew that defendant was a suspect. He also saw defendant transferred to a police van. It was a fair argument on behalf of the State that a man who knew defendant well and who testified that he had particularly taken notice of the time of specific events, would have mentioned something to the police when given an opportunity to speak. We believe that the cross-examination was properly founded and was relevant to the jury's determination of the credibility of the witness.

315

DECISION

The judgment and sentence of the Circuit Court are affirmed.

Affirmed.

McCORMICK, P. J. and DRUCKER, J., concur.