322 A.2d 36.

STATE *vs.* RONALD E. SPRAGUE.

JUNE 24, 1974.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

PAOLINO, J. The defendant was charged with violating G.L. 1956 (1968 Reenactment) §31-14-1.[1] The complaint and warrant alleges that he operated a motor vehicle on October 26, 1971, "* * * on Rt. 95, a public highway in the City of Warwick, in the State of Rhode Island, at a speed greater than was reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing, in that he did operate, said motor

---

[1]General Laws 1956 (1968 Reenactment) §31-14-1 reads as follows:

"Reasonable and prudent speeds.—No person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing. In every event, speed shall be so controlled as may be necessary to avoid colliding with any person, vehicle, or other conveyance on or entering the highway in compliance with legal requirements and the duty of all persons to use due care.

vehicle on said highway at a radar speed of 75 MPH in excess of the 60 miles per hour legally established speed limit." The case was heard before a justice of the Superior Court sitting with a jury and resulted in a verdict of guilty. The matter is before this court on the defendant's appeal from the judgment entered in that court.

## I

The defendant's first contention is that Interstate Route 95 is a freeway, not a highway, and therefore the provisions of §31-14-2[2] do not apply. We do not agree.

Section 31-1-23(a) defines a highway as the "* * * entire width between boundary lines of every way when any part thereof is open to the use of the public for purposes of vehicular traffic." This is the definition that applies here. Title 31 deals with "Motor and Other Vehicles."

----

[2]General Laws 1956 (1968 Reenactment) §31-14-2 reads as follows:

"Prima facie limits.—Where no special hazard exists that requires lower speed for compliance with §31-14-1 the speed of any vehicle not in excess of the limits specified in this section or established as hereinafter authorized shall be lawful, but any speed in excess of the limits specified in this section or established as hereinafter authorized shall be prima facie evidence that the speed is not reasonable or prudent and that it is unlawful:

"(1) Twenty-five (25) miles per hour in any business or residence district;

"(2) Fifty (50) miles an hour in other locations during the daytime;

"(3) Forty-five (45) miles per hour in such other locations during the nighttime;

"(4) Twenty (20) miles per hour in the area within three hundred (300) feet of any school house grounds' entrances and exits during the daytime during the days when schools shall be open.

"(5) The provisions of subdivision (4) of this section shall not apply except when appropriate warning signs are posted in proximity with the boundaries of the area within three hundred (300) feet of such school house grounds, entrances and exits.

"Daytime means from a half hour before sunrise to a half hour after sunset. Nighttime means at any other hour.

"The prima facie speed limits set forth in this section may be altered as authorized in §§31-14-4 to 31-14-8, inclusive."

It contains no definition of freeway. As the state points out, if the term "highway" were interpreted for the purpose of §31-14-2 as not including Interstate Route 95, then the result would be that the state would be without authority to regulate speed on interstate highways. We do not believe that the Legislature intended such an unreasonable result. Statutes are not to be so construed as to reach meaningless or absurb results, *State* v. *Milne*, 95 R. I. 315, 321, 187 A.2d 136, 139 (1962), and, as we said in *State* v. *Lemme*, 104 R. I. 416, 423, 244 A.2d 585, 589-90 (1968), where one construction of an act of the Legislature operates to defeat an otherwise legitimate legislative intendment while another serves to support it, we will adopt the latter construction.

We hold that §31-1-23(a) is applicable here and that Interstate Route 95 is a highway for the purpose of §31-14-2. Section 24-10-1, which defines a freeway as "* * * a way especially designed for through traffic over which abutters have no easement or right of light, air or access by reason of the fact that their property abuts upon such way," is not in conflict with our conclusion that Interstate Route 95 is a highway within the meaning of §31-14-2. It merely defines the rights of abutting property owners with respect to easements or rights of light, air or access.

## II

The defendant next contends that the tuning fork used to test the accuracy of the radar speed meter readings must be proved accurate before the radar speed meter readings are admitted into evidence.

Trooper Francis J. Martin, the officer who stopped defendant, explained how he operated the radar set he was using. He testified that he calibrated his radar unit with

a tuning fork.[3] When he was asked by the state's attorney whether or not the radar set was in proper working order, defendant objected on the ground that there was no proof that the tuning fork was accurate. The trial justice overruled the objection and the officer was permitted to testify that the radar set was in proper operating order.

This question is one of first impression in this state. Since we have no decisions of this court directly in point we look for guidance to analogous cases in this state and cases in other jurisdictions which have passed on this question.

In *State* v. *Barrows*, 90 R. I. 150, 152, 156 A.2d 81, 82 (1959), the arresting officer testified that he pursued the defendant and, from his observation of the speedometer in his police car, determined that the defendant was driving at 65 miles per hour. The defendant objected to the admission of this testimony on the ground that it was inadmissible unless evidence as to the accuracy of the speedometer was first adduced. Another officer testified that he had recently tested the accuracy of the speedometer in the arresting officer's car by comparing it at various speeds with the readings observed on the speedometer of an accompanying motorcycle. The defendant then renewed his motion to strike on the ground that there was no show-

---

[3]Trooper Francis J. Martin explained how he operated the radar set as follows:

"Well, the head of it is placed on a hook on the window of the car on the outside of the car. The meter which reads to the actual speed is separate. It is connected to the head by a cord and it's plugged into the cigarette lighter of the car. When you first get there, or when you're going to set up the radar, you wait approximately ten or fifteen minutes waiting for the thing to heat up and then you take a tuning fork and outside you would bring the tuning fork and hold it in front of the head of the radar and if it was on, if the radar was set properly, it would read 65 miles an hour because that is what the tuning forks are set for, 65."

ing that the accuracy of the speedometer on the motor-cycle had been determined.

In *Barrows* we held that the testimony as to the speed at which the defendant's automobile was being operated, based on an observation of the speedometer readings in the arresting officer's motor vehicle, was admissible in evidence upon a showing that the operational efficiency of the device had been tested by an appropriate method within a reasonable period of time.

Although *Barrows* involved the accuracy of a speed-ometer while the instant case involves the accuracy of a radar unit, it seems to us that the cases are analogous and that the reasoning in *Barrows* should apply here. The evidence in the case at bar shows that the operational efficiency of the radar unit was tested within a reasonable time by an appropriate method, that is, the tuning fork. If we did not require the motorcycle speedometer in *Barrows* to have been previously tested as accurate, why should we require the tuning fork to have been previously tested?

When we look at the cases in other jurisdictions for an answer to this question, we find, as defendant admits, a split of authority on the question of whether it must be shown that the tuning fork must have been previously tested for accuracy. Some cases support defendant's view, but we think the better rule is the one stated in *People* v. *Abdallah*, 82 Ill. App.2d 312, 226 N.E.2d 408 (1967), where the court held that radar speed meter readings are admissible without a prior showing of the reliability of the tuning fork that was used to test the accuracy of the radar unit.

Officer Martin's testimony setting forth his training and experience in the use of a radar unit, in addition to his testimony describing the tuning fork test on the day defendant was stopped, is reasonable and sufficient proof of

the accuracy of the radar unit, and therefore the reading taken therefrom was admissible even though the tuning fork used to test the accuracy of the radar device was itself not tested for accuracy.

## III

Under point III defendant argues that an in-court showup identification is inadmissible into evidence and deprives defendant of due process of law as guaranteed to him by art. XIV, sec. 1 of amendments to the Constitution of the United States.

During direct examination the state's attorney asked Trooper Martin if he saw in the courtroom the operator of the motor vehicle he stopped. At that time defendant was seated at counsel table with his attorney. The defendant objected, arguing that such in-court identification violated the *Wade, Gilbert, Stovall,* trilogy.[4] The trial justice overruled defendant's objection and allowed the officer to answer. He identified defendant as the operator of the car he stopped.

In urging error, defendant contends that the in-court identification is subject to the standards set forth in *Wade.* He cites *People* v. *McMath,* 104 Ill. App.2d 302, 244 N.E. 2d 330 (1968). *Wade, Gilbert* and *Stovall* are not applicable to the situation presented here; those cases were concerned only with pretrial identification procedures. *Allen* v. *Rhay,* 431 F.2d 1160 (9th Cir. 1970); *United States* v. *King,* 433 F.2d 937 (9th Cir. 1970). *People* v. *McMath, supra,* merely follows the rationale of *Wade, Gilbert* and *Stovall;* it does not extend the doctrine of those cases to identification procedures at a trial. The defendant has

---

[4]*United States* v. *Wade,* 388 U. S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert* v. *California,* 388 U. S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *Stovall* v. *Denno,* 388 U. S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

cited no authority, nor have we found any, which supports his position. Hence, we hold that the trial justice's ruling allowing Trooper Martin to identify defendant in the courtroom was not error.

## IV

The defendant next argues that a defendant who takes the stand but does not actually testify may not have his credibility impeached by evidence of uncounseled prior nolo and guilty pleas in traffic cases.

The question of whether a defendant who takes the stand but does not testify can be impeached by evidence of prior convictions is not properly before us since the transcript shows that he did testify. The defendant took the stand and was duly sworn as a witness. His counsel then said "No questions," but after the state's attorney completed his cross-examination, defendant testified on redirect examination by his own counsel and again on recross-examination by the state.

We come now to the question of uncounseled prior nolo and guilty pleas in traffic cases. Under cross-examination by the state's attorney, defendant admitted, over his attorney's objection, that he had paid a fine on prior occasions for speeding. In redirect examination defendant's counsel elicited from defendant that he was not represented by counsel on any of those occasions. The defendant argues that, in the circumstances, the trial justice committed error in allowing this evidence and in instructing the jury that it had a right to such evidence in passing on defendant's credibility.

We shall assume for the purpose of this case that the trial justice erred in ruling that the record of the uncounseled prior convictions was admissible to impeach defendant's credibility. *See Loper v. Beto,* 405 U.S. 473, 92 S.Ct. 1014, 31 L.Ed.2d 374 (1972). Nevertheless, in view of the

overwhelming evidence in this record that defendant was operating his vehicle in violation of §31-14-1, we conclude that the admission of the prior speeding convictions and the trial justice's charge relative thereto was harmless error beyond a reasonable doubt. *State* v. *Palmigiano,* 112 R. I. 348, 357, 309 A.2d 855, 860 (1973).

## V

, ·Peter F. McBride, a principal engineering aid in the Division of Traffic Engineering in the Department of Transportation, was called as a witness by the state. He testified that he works directly under Paul Romano, traffic engineer and secretary of the State Traffic Commission; that his duties are to keep the minutes of the State Traffic Commission; that the records are kept in the ordinary course of business; and that the traffic engineering section has custody of the records. Mr. McBride then testified that at the state's request he brought with him certain records pertaining to the speed limit on the portion of Interstate Route 95 involved in this case. The trial justice, over defendant's objection, admitted these records into evidence as state's exhibit 1.[5]

We believe that the answer to the question put by defendant is found in *State* v. *Jamgochian,* 109 R. I. 46, 280 A.2d 320 (1971) and *State* v. *Guaraneri,* 59 R. I. 173, 194 A. 589 (1937). In *Guaraneri,* the court held that in a criminal case if a proper foundation is laid for the admission of business records, they should be admitted as an exception to the hearsay rule. The court said:

> "Before a hospital record is admissible in evidence, it must affirmatively appear that it was a matter of duty to keep such a record in the regular course of the hospital's business, and the person whose duty it was to keep that record, if living, competent and within

---

[5]State's exhibit 1 consists of two pages and is a copy of the minutes of the State Traffic Commission meeting of September 16, 1965.

the jurisdiction, must testify that the entry was made in the regular course of business in his handwriting or under his immediate supervision. If the person who made the entries is dead, incompetent or beyond the process of the court at the time of trial, other witnesses may identify the record as to how and by whom it was kept." *Id.* at 177, 194 A. at 591.

In *Jamgochian, supra* at 50, 280 A.2d at 322-23, we held that the necessary implication from the language in *Guaraneri* is that book entries kept in the regular course of business may be admitted in a criminal case if the proper foundation is laid.

A careful reading of Mr. McBride's testimony shows that the *Guaraneri* tests have been met and, therefore, we hold that the records in question were properly admitted.

## VI

We consider next defendant's contention that the minutes of the State Traffic Commission of September 16, 1965, state's exhibit 1, were null and void by reason of the expiration of the agency empowered to promulgate them at the time of the offense, October 26, 1971. On September 16, 1965, G.L. 1956, §31-13-1, was in effect. It provided for the establishment of a State Traffic Commission of three members and authorized the commission to establish traffic regulations. In 1968 the General Assembly amended that statute by creating a commission consisting of four members rather than three.

The defendant cites *United States* v. *Hawthorne,* 31 F. Supp. 827 (N.D. Tex. 1940) to support his argument that the rules and regulations promulgated by the State Traffic Commission prior to the 1968 amendment to §31-13-1 are null and void. But a reading of that case shows that the act in question there was repealed. In the case at bar the situation is different. The 1968 amendment to §31-13-1 did not repeal that statute and, consequently, it did not

make null and void the rules and regulations of the State Traffic Commission promulgated prior to said amendment.

## VII

The defendant here urges another ground to support his objection to the introduction of state's exhibit 1. He argues that the authority given to the State Traffic Commission under §31-14-4,[6] is to alter the prima facie limits of reasonable speed and not to establish an absolute speed. He contends, therefore, that

> "State's exhibit number 1, a regulation promulgated by the State's Traffic Commission establishing a speed limit of 60 miles per hour on interstate 95 is unlawful by reason of it being ultra vires."

We find no merit in defendant's argument.

Section 31-14-2, *see note 2, supra,* establishes prima facie speed limits which may be altered in accordance with the provisions of §31-14-4 to §31-14-8, inclusive. Sections 31-14-2(1) to 31-14-5 indicate that a specific limit is set under the various conditions set forth therein, but it is apparent from an entire reading of §31-14-2 that the Legislature did not establish absolute speed limits but rather provided that speeds in excess of those stated are prima facie evidence of unreasonableness. *State v. Lutye,* 109 R. I. 490, 287 A.2d 634 (1972); *State v. Costakos,* 92 R. I. 415, 169 A.2d 383 (1961). We agree with the state's position that,

---

[6]General Laws 1956 (1968 Reenactment) §31-14-4 reads as follows:

"Alteration of prima facie limits by traffic commission.—Whenever the state traffic commission shall determine upon the basis of an engineering and traffic investigation that any prima facie speed hereinbefore set forth is greater or less than is reasonable or safe under the conditions found to exist at any intersection or other place or upon any part of a highway, said commission may determine and declare a reasonable and safe prima facie speed limit there at which shall be effective at all times or during hours of daylight or darkness or at such other times as may be determined when appropriate signs giving notice thereof are erected at such intersection or other place or part of the highway."

when the traffic commission authorized the 60 miles per hour speed in question, it was following the format of §31-14-2, whereby speed limits are set under certain conditions and the remainder of the statute is incorporated thereby making those limits prima facie evidence of unreasonableness rather than absolute speed limits.

## VIII

The defendant urges still another ground in support of his claim that state's exhibit 1 was improperly allowed into evidence. He asserts here that an administrative regulation may not be admitted into evidence absent a showing of advertising and filing thereof with the Secretary of State in accordance with the Administrative Procedures Act. His argument, of course, is that there is no evidence here of such compliance.

The regulation in question was adopted on September 16, 1965, and the trial was held on February 15, 1973. General Laws 1956 (1969 Reenactment) §42-35-3 prescribes the procedures to be followed prior to the adoption, amendment, or repeal of any rule by an administrative agency. Section 42-35-3(c) reads as follows:

> "No rule hereafter adopted is valid unless adopted in substantial compliance with this section, but no contest of any rule on the ground of non-compliance with the procedural requirements of this section may be commenced after two (2) years from its effective date."

There is no evidence here that the regulation was contested within two years after its adoption and therefore it must be presumed that it was validly adopted. *See State v. Lombardi*, 110 R. I. 776, 298 A.2d 141 (1972). In the case at bar the presumption of validity is strengthened by the minutes of the State Traffic Commission of September 29, 1967, which are in evidence as state's exhibit 2, stating that all minutes of the commission prior to October

1, 1965, were to be filed with the Secretary of State. In the circumstances defendant's instant argument is of no help to him.

### IX

The defendant's final contention is that the trial justice abused her discretion in sustaining the state's objection to certain questions put by defendant's counsel while cross-examining Mr. McBride with reference to the latter's personal knowledge about the filing of state's exhibit 1 with the Secretary of State.

The scope of cross-examination is usually within the sound discretion of the trial justice and will not be disturbed by this court except for a clear abuse of such discretion. *State* v. *Jamgochian, supra.* The trial justice based her ruling on the ground that whether or not the witness had personal knowledge about the filing of state's exhibit 1 was not germane. When her ruling is examined in the context of all the evidence presented relative to exhibit 1, we cannot say that there was an abuse of discretion here. In any event, even if there were, in view of our conclusion with respect to the defendant's contention under point VII, we fail to see how the defendant would be prejudiced thereby.

The defendant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court for further proceedings.

*Richard J. Israel,* Attorney General, *Donald P. Ryan,* Asst. Attorney General, *R. Raymond Greco,* Special Asst. Attorney General, for plaintiff.

*Berberian & Tanenbaum, Aram K. Berberian,* for defendant.