THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RICHARD W. VanZILE, Defendant-Appellant.

Fourth District   No. 13559

Opinion filed May 23, 1977.

974

Walter H. Kasten, of Springfield, for appellant.

C. Joseph Cavanagh, State's Attorney, of Springfield (J. William Roberts and Edward W. Huntley, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MILLS delivered the opinion of the court:

VanZile was convicted of aggravated kidnapping, armed robbery and burglary by a jury and was sentenced to 20 to 60 years. A co-indictee, Massey, pleaded guilty following plea bargaining, was sentenced to 10 to 30 years and was the star witness against VanZile.

Errors assigned include: improper cross-examination of some defense witnesses—collectively referred to in closing argument as being from the "Menard Penitentiary Witness Bureau"; exclusion of the testimony of one witness whose testimony would have been the same as other witnesses; admission in rebuttal of two prior consistent statements of Massey; denial of another witness' testimony; failure to grant a mistrial after testimony that defendant had committed another crime (smoking marijuana); error in admitting in evidence defendant's silence following *Miranda* warnings; inflammatory closing argument; outright reversal because the proof was not beyond a reasonable doubt; and, finally, if we affirm, that we should reduce the sentence.

An extensively detailed recital of the facts is not necessary. Rather, somewhat more than usual heed must be paid to the presentation of proof rather than the proof itself. Briefly, Massey testified that he and VanZile had planned the kidnapping for ransom of two Springfield residents. They procured masks and gloves, took their guns, and in the early morning hours of October 24, 1974, went to the home of the victims. They laid in wait in the garage and when the wife came out, they took her into the house at gunpoint, told her husband they wanted $20,000 in small bills, and he then by telephone made arrangements for the money with a bank of which he was a director. The wife was then tied to a bed and Massey stayed with her. Defendant went with the husband. Following VanZile's directions, the husband-victim then went to the bank, got the money, returned on a prearranged route, gave two long horn blasts at a designated point and proceeded back home. Massey, still there with the wife, took the money from the husband, ordered him into the trunk of her car, drove to a remote area, ordered him out and drove off, following a warning not to call any law enforcement officers and to stay put. The husband shortly thereafter gave the alarm. Both he and his wife were unhurt. The kidnappers rendezvoused and went to Massey's home where defendant also lived.

Some "bait" money in the form of prerecorded serial numbers of bills had been included in the $20,000 by bank personnel who became

understandably suspicious when they received the call for the money. That same day an informer advised the police that defendant and Massey were the kidnappers. A search warrant was issued and Massey's residence searched. $1,000 in tens, twenties and fifties was discovered, plus $250 in VanZile's room. Massey, his wife and defendant were arrested and charged with the crime. Defendant gave permission for a search of his car where over $9,000 was found in the trunk along with an automatic. VanZile was given the *Miranda* warnings, was told about the gun, denied that he owned one and said "he didn't want to talk about it." At about the same time Massey admitted his involvement and that of defendant, but said that his wife was not involved. He likewise gave his acquiesence for a search of his wife's car. Over $8,000 was found. Massey then gave a written statement to the police which was in substantial conformity with his oral statement. Mrs. Massey was indicted for obstruction of justice. The plea bargaining agreement contemplated the dropping of her charge, Massey's testimony against defendant and a sentence of 10-30 years. The contract was made and the agreement was lived up to. Mrs. Massey also testified as to what she knew. Defendant denied any involvement.

### CROSS-EXAMINATION

With regard to the first error raised—improper cross-examination— seven persons testified for defendant that Massey had told them, or they had heard Massey tell others, that defendant was not involved, that a person unnamed was his partner in crime. These statements were purportedly made either at the Menard Penitentiary or in the Sangamon County Jail. According to one of these witnesses, Massey would not say who helped him but that this person had gotten word to him that if he changed his story, that is, *not* implicate defendant, his wife would be killed. This witness, as well as all the other six, were examined as to why they would not talk to investigators sent by the State's Attorney. Certain of these witnesses were out on bond, and this was brought out on cross-examination. Others were cross-examined about their appearances as defense witnesses in another criminal case that had taken place previously and about visiting their families while in Springfield for defendant's trial. All of these witnesses were asked by investigators or police what they knew and all had refused to talk.

■■ Is the refusal to talk to the State's investigators admissible as evidence? Or to put it more directly, was such proof germane to any issue being tried? If it was not, can its admission otherwise, as the State suggests, find approbation in the rule that the extent and latitude of cross-examination is generally for the trial court and such will not cause a reversal unless there has been an abuse of discretion? This latter question answers itself, however, because if this cross-examination was improper,

then it would appear to us to be an abuse of discretion, because, no matter how we look at it, evidence that seven witnesses had refused to talk to agents of the State's Attorney in a criminal trial is very damaging indeed. It attacks severely their credibility, for, if one is telling the truth, why not tell such truth to anybody who asks? To our view, there is a reasonable inference to be drawn from a refusal to discuss a matter which would lead reasonable men to wonder if what the witness has testified to was indeed the truth. But in giving the answer as to whether or not there has been abuse of discretion, we also answer the earlier questions.

■■ The credibility of a witness is always an issue—more correctly, *in* issue. A refusal to talk in advance of trial to the other side reasonably *could* indicate hostility by the witness to the inquiring side, or at least a bias for, or an interest in, a favorable outcome for the side calling him. We say "could" because triers of the fact need not invariably so conclude, but they reasonably can do so. And if triers of the fact can reasonably infer this, then we do not have forbidden impeachment on a collateral matter, but rather on a very germane matter: the credibility of that witness. Likewise, an imprisoned witness being allowed to visit his family and his prior testimony in previous trials reasonably implies, we think, that such witness could be a professional (we use the word invidiously) witness in that he desires a change of scene or just plain likes to testify, both of which reflect on his very oath and his possible disinclination to tell the truth. The testimony adduced on cross-examination as to one of the witnesses being out on bond and urged as improper was actually brought out on direct by the defense, and thus the "open door" doctrine applies absolving error.

■■ Under our present system of liberal discovery, both sides at a minimum know the witnesses who will oppose them. Admittedly, both sides have the right to attempt to interview the other's witnesses. Admittedly too, witnesses have a corollary right not to be interviewed if they so choose. But this refusal, in our opinion, can be used against them to argue bias, hostility, interest in outcome, all of which look to credibility. It is a risk the witness or his side takes. That these are reasonable inferences from such conduct cannot be gainsaid. Although they are not inexorable, they are reasonable. It is up to the trier of the fact to accept or reject them. No cases are cited to us squarely in point. The State analogizes the situation to that where a witness failed to assert a fact in a context in which it would have been likely for him to assert it. In *People v. McMath* (1968), 104 Ill. App. 2d 302, 244 N.E.2d 330, an alibi witness was present when defendant was taken into custody in the witness' place of business. He knew that defendant was in custody, knew that a crime had been committed, that defendant was a suspect (indeed, the police questioned defendant in his presence). At the trial he testified

that defendant had been in his place of business at the time of the crime. The State was then permitted to bring out on cross-examination his silence at the time defendant was in his presence for the purpose of bringing his credibility into question. As it most certainly did. The court considered this a permissible "tactic": " * * * the prosecutor argued that the failure of [the witness] to speak in defendant's defense at the service station was an indication contrary to his extensive alibi testimony at trial. We feel that the prosecutor's tactic here was permissible" (104 Ill. App. 2d 302, 315, 244 N.E.2d 330, 336), and concluded that the cross-examination "was properly founded and was relevant to the jury's determination of the credibility of the witness."

Yet this analogy is not wholly satisfactory. The silence of the witness is more akin to a prior inconsistent statement. Reasonably he should have said something but did not. The inferences so raised by silence became inconsistent with his testimony. We may be crossing a threshold, but it seems to us that when one is asked to be interviewed on what his testimony will be, he declines at the risk that he may be asked later on at trial about such fact and his reasons therefor. It is a risk he takes. Perhaps it can be explained away, but it is nonetheless still a risk. Again, the lack of cases is a puzzlement. We think that it is proper to bring out on cross-examination the fact that the witness has refused to talk to the examiner's side of the case where a fifth amendment privilege against self-incrimination of that witness is not relevant.

Although a civil case, *Goertz v. Chicago & North Western Ry. Co.* (1958), 19 Ill. App. 2d 261, 153 N.E.2d 486, held it proper to examine a witness (as was done here) where it was claimed (as here) that this was error as being impeachment on an immaterial matter. The trial court had permitted an important witness for defendant to be asked to recall whether someone on behalf of plaintiff had asked him for a statement concerning the accident. He could not recall. And with regard to this the reviewing court said:

> "It was material to show that he refused to give such a statement. Neither was defendant's witness [named] discredited on immaterial question, the time after the accident when he first saw defendant's representative and who it was he saw. * * * Memory, powers of observation and bias are several elements a jury must consider when evaluating testimony." 19 Ill. App. 2d 261, 272, 153 N.E.2d 486, ___.

Cases cited by defendant have variations in factual context which make them readily distinguishable, just as the cases cited by the State as to the failure to assert a fact when otherwise it might have been expected. They are neither applicable nor persuasive here.

Defendant argues that there was something disingenuous, hence

improper, in the State attempting to interview these witnesses because they knew full well that they wouldn't talk to them. It is pure surmise and nothing more to say that the investigators knew that they would get the very nonanswers they got. They had a right, at least, to make the attempt.

## Exclusion of Witness

The testimony of a putative eighth witness from the Menard Penitentiary who, an offer of proof showed, would testify that Massey had said in his hearing that defendant was not involved, was excluded and such is claimed as error. The reason assigned for the exclusion of his testimony, and urged as justification therefor by the State, was that his name was not on a list of witnesses furnished to them in midtrial by defense counsel.

To sharpen our focus, we need to examine the context more closely. After a week of trial, defendant came up with the names of several witnesses (all in the penitentiary) who would contradict Massey as to defendant's complicity. These names were given to the State on Friday morning. Defendant's counsel thereupon requested a continuance in order to interview these potential impeachment witnesses. Over the State's objection, the continuance was granted and counsel departed for the penitentiary to determine their availability, and indeed their suitability, as witnesses for his client. In granting the continuance the court ruled that two of the witnesses from the amended list would be allowed to testify. The name of the excluded witness was not on this list. Upon the following Tuesday defendant's counsel proffered the additional name, but this proffer of the unnamed witness was denied for the reason that no good cause was shown for the additional testimony. The State, naturally, claimed prejudice through surprise. That is, no time to interview, or, at least, attempt to.

■■ Defendant argues that this was an abuse of discretion. He goes further. He says the court has no power to limit the number of witnesses. This is true, of course, as to witnesses of controlling facts, so-called occurrence witnesses. However, this witness was not that. He was merely an eighth impeaching witness as to the prior inconsistent statement of Massey. We think a court can reasonably limit the number of impeaching witnesses; certainly in our context. Furthermore, the inconsistent statement was the very same statement that other witnesses had testified to and that this witness had simply overheard. Defendant argues that this witness had an aura of greater veracity than the others because he did not know VanZile and had not been interviewed vainly by the prosecution's investigators. This does not sway us. The court had discretion and in this context the exclusion was proper. We cannot say that as a matter of law any prejudice resulted to defendant from this action. That the court could

have permitted such testimony is not the same thing as saying that it must. We emphasize again that this witness was not an occurrence witness. If defendant's case was prejudiced by the exclusion, he made no showing of such.

### PRIOR CONSISTENT STATEMENTS

■■ In rebuttal the court admitted two prior *consistent* statements of Massey. The partial foundation for this rebuttal evidence was the testimony of the seven witnesses of prior contradictory and inconsistent statements by him negating complicity by defendant. This foundation, standing alone, would not be enough to permit the admission of prior consistent statements. The rule is well established that where a witness has been impeached by out of court statements which contradict his testimony on the stand, evidence of other previous statements which agree with the witness' testimony are not competent. But there is an exception to this rule: where the attack by inconsistent statements may be interpreted as a plan to give false testimony, or to show that the witness is biased or has some other motive to falsify. Proof then of his consistent statements made prior to the time the plan or contrivance was concocted are properly received in evidence in support of his testimony.

Do these conditions exist here? A little legal background on this esoteric point is helpful. Wigmore states as a preface that an accomplice, whether a co-indictee or not, is always under a suspicion of discredit, implied from his interest to screen himself and to secure the conviction of his companions. He then asks the same question as we have: "Is it permissible to support him by the fact that he told a consistent story before taking the stand?" He answers as we have, up to this juncture, that it would seem not *unless* by some mode of impeachment some other principle becomes applicable. And the principle he refers to is the rule that a prior consistent statement may be offered after impeachment as to recent contrivance:

> "Impeachment on the ground of Recent Contrivance must be distinguished (as it is not always) from the foregoing ground. It is more nearly connected with the case of impeachment by Self-Contradiction. The charge of Recent Contrivance is usually made, not so much by affirmative evidence, as by negative evidence that the witness did *not* speak of the matter before, at a time when it would have been natural to speak; his silence then is urged as inconsistent with his utterances now, *i.e.* as a Self-Contradiction [Citation]. The effect of the evidence of consistent statements is that the supposed fact of not speaking formally, from which we are to infer a Recent Contrivance of the story, is disposed of by denying it to be a fact, inasmuch as the witness did speak and tell the same story:

* * *

In judicial rulings, this use of former similar statements is universally conceded to be proper; though occasionally it is difficult to apply the principle to the facts." 4 Wigmore on Evidence §1129, at 205-06 (3d ed. 1940).

■■ Does this case fall within the shadow cast? While acknowledging the correctness of the rule as we have stated it, defendant denies its applicability. He says that the motive to fabricate or to contrive came *before* the time of the giving of the prior consistent statements, or, to paraphrase it in the language of the rule, the consistent statements were made *after* the time the plan or contrivance was concocted. Defendant states that at the time of his arrest Massey was concerned about the involvement of his wife, that this was his motive to falsify and that his consistent statements followed that occurrence or happenstance. In answer, the State downgrades this motive and says that the motive to falsify, if there was one, came during the plea bargaining. That is, to get a good deal, he was willing to testify falsely against defendant. This argument, it seems to us, is buttressed by the fact that several of the impeaching witnesses from the penitentiary testified that the reason Massey gave for sticking with his story that defendant was his accomplice was that his true partner would kill his wife if he did not. While Massey was concerned about his wife at the time he was arrested and before he gave the consistent statements, we can discern from the evidence no proof that making these statements would result in his wife either being or not being prosecuted. That he was concerned is not a motive to fabricate unless it can be coupled with some proof that his concern would be alleviated or dispelled by giving the statements that he did. Rather, it strikes us, as it did to the court below, that the time of the motive to fabricate or concoct came during the initiation of plea bargaining. *Then* the motive to fabricate, if any, would have arisen; for a promise of leniency, he would acceed to a plan to give false testimony. If there was a time for this plan or contrivance to be plotted it was at this stage, and this stage was *after* the oral and written statements had been given to the police, and *before* a motive to falsify came into authentic existence. Accordingly, this mode of testimonial rehabilitation utilized by the State (which has been the rule in Illinois since *Gates v. People* (1853), 14 Ill. 433) was eminently proper. In that case it was said:

> "The authorities all agree that the former statements of the witness, may in some instances be introduced for the purpose of sustaining his testimony; as where he is charged with testifying under the influence of some motive prompting him to make a false statement, it may be shown that he made similar statements at a time when the imputed motive did not exist, or when motives of

interest would have induced him to made a different statement of facts. So in contradiction of evidence tending to show that the witness's account of the transaction was a fabrication of a recent date, it may be shown that he gave a similar account before its effect and operation could be forseen." (14 Ill. 433, 438.)

The rule has received our Supreme Court's continuing *imprimatur* as recent as *People v. Powell* (1973), 53 Ill. 2d 465, 292 N.E.2d 409.

### EXCLUSION OF WITNESS

■■ Defendant's next point need not long detain us. He desired to call a corporal of the State police as a witness to effect the rehabilitation of one of his witnesses. He had called a witness who was not too certain as to some facts he considered pertinent (he had a prior statement given by the witness to the corporal in which there was greater specificity) and he wanted to call him to fill in the gaps as he saw them. But clearly, whether we call this impeaching one's own witness or an attempt at testimonial rehabilitation, there is no way defendant can get around the rule against hearsay so far as this witness is concerned. The corporal would only know what this witness had told him when he interviewed her. That the State might have used him after laying a foundation for impeachment does not argue that the calling side can straighten out its own witness by calling another as to what this witness told him. The corporal was not in a position to offer any substantive proof of the facts this witness had testified to and his testimony, if permitted, would have been of the rankest hearsay. Accordingly, the court was right in denying this witness to defendant. We might also add that the usual factors necessary for this witness to be called as a court's witness were not present. She was not an occurrence witness, nor does the defense claim that she was hostile or that it was surprised. The prior statement was not used to refresh her recollection or to "awaken her conscience," as it is sometimes euphemistically put. Prior inconsistent statements, if this was one, cannot take the place of substantive evidence. The state of mind of this witness, said by the defendant to be pertinent and which possibly might supply an exception to the hearsay rule, is most certainly not an issue in this case, as she was not involved in the occurrence at all.

### EVIDENCE OF PRIOR CRIME

■■ Defendant next argues that a mistrial should have been declared following testimony by Massey that after the crime had been committed, they went home, "drank beer and smoked marijuana." Defendant objected to this and sought a mistrial. The court sustained the objection and ordered the jury to disregard the statement that defendant had

smoked marijuana. No one doubts that this testimony was improper. The question is: Does its admission warrant a new trial?

Viewing the totality of the evidence—the proof of guilt was overwhelming in our opinion as Massey was corroborated by his wife, by the money found in the trunk of defendant's automobile and voice identification by one of the victims—we cannot say that error is clearly shown. As was said in *People v. Oliver* (1970), 129 Ill. App. 2d 83, 91, 262 N.E.2d 597:

> "It is axiomatic that a declaration of mistrial lies within the sound discretion of the trial court, and unless error is clearly shown by the record, such discretion will not be second-guessed by a reviewing court."

In our opinion, the instruction to the jury to disregard this evidence, in our evidentiary context, suffices to cure the error, though we are not in any way condoning it. We might further note that its utterance was not contrived or intended and no further allusion to it was had. (*People v. Dukett* (1974), 56 Ill. 2d 432, 308 N.E.2d 590.) The cases cited by defendant involve testimony that was probative of the offense being tried, while here smoking marijuana bears no relationship to the offenses of which he was convicted.

### SILENCE OF DEFENDANT

■■ The same can be said for the next argument, that it was error to admit evidence of defendant's refusal to make a statement after the *Miranda* warnings. Again, its introduction was inadvertent, and the court instructed the jury to disregard such testimony. Reversal is common in these situations where it was apparent that the prosecution had intentionally elicited the forbidden testimony: the refusal to answer questions following the warnings. In *People v. Marchese* (1975), 32 Ill. App. 3d 872, 880, 336 N.E.2d 795:

> " * * * such testimony must be viewed in the totality of circumstances, including the extent of the testimony and the other evidence adduced at trial."

Our situation, too, is somewhat different. Defendant here did not remain silent, but rather stated, according to the witness:

> " * * * and I told him we had found a quantity of money and an automatic pistol in the trunk of his automobile and asked him if he wanted to talk about it. He stated that he didn't own a gun, and he didn't want to talk about it."

The State disclaimed the testimony and joined in the motion to strike. As we have said, the court instructed the jury to disregard it. No further allusion was had during the trial "that he didn't want to talk about it." In some respects, it can be argued that he didn't want to talk about "owning

a gun." That as it may be, we do not view this inadvertent utterance as constituting reversible error when considered with all the evidence.

## STATE'S CLOSING ARGUMENT

■■■ Defendant complains of the closing argument of the State as inflammatory. But for the prosecution to dwell upon the evils of crime and urge fearless administration of the criminal law has always been proper. The remarks of the State's Attorney that crimes such as this have "got to stop, ladies and gentlemen," and "Because if it doesn't, the next time you or your loved ones is held up, kidnapped, robbed, beaten, there'll be no conviction of the assailant," all fall within this concept. The cases pointed to by defendant go far beyond the simple urging of fearless administration of the criminal law. Nor do we view the statement and argument with reference to the witnesses who supplied the prior contradictory statements of Massey as coming from the "Menard Penitentiary Witness Bureau" as anything but a comment on the evidence. If so, it was proper. The State certainly had a right to cast aspersions on their credibility and in taking it amiss, or as error, defendant is mistaken.

## SENTENCE

■■ Lastly, should the sentence imposed be reduced in this case? No. The court below made a valid distinction between the sentence Massey received (10-30) and that meted out to VanZile (20-60). Aggravated kidnapping is a Class 1 felony, and the sentence was within the limits authorized by law. The distinction the court made between defendant and Massey is that the former:

> " * * * had the gun right up against [the victim's] temple, or right against his head, could have pulled the trigger just accidentally, just a little pressure and killed him * * *."

The court concluded by stating that he did:

> " * * * feel that the chances of these two victims of getting killed were greater at the hands of this defendant VanZile than they were at the hands of the defendant Massey."

This is a valid distinction, and in our opinion the sentence was proper.

The argument that VanZile was not proved guilty beyond a reasonable doubt, we have already answered with our earlier statement that the proof was overwhelming.

Affirmed.

TRAPP, P. J., and GREEN, J., concur.